STATE of Tennessee, DEPARTMENT OF CHILDREN'S SERVICES

v.

S.M.D.

Re: D.J.D.; L.J.D.; Q.A.M.; D.I.M.M.; C.M.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Assigned on Briefs Feb. 15, 2006.

April 18, 2006.

Permission to Appeal Denied by Supreme Court July 24, 2006.

Cara C. Welsh, Chattanooga, Tennessee for the Appellant, S.M.D.

Paul G. Summers, Attorney General and Reporter and Amy T. Master, Assistant Attorney General for the Appellee, State of Tennessee, Department of Children's Services.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

The State of Tennessee, Department of Children's Services ("the State") filed a petition to terminate S.M.D.'s ("Mother") parental rights to five minor children ("the Children"). The case was tried and the

Juvenile Court entered its order on July 5, 2005, *inter alia,* terminating Mother's parental rights to the Children. Mother appeals claiming that there was no clear and convincing evidence to support the grounds for termination, that the Juvenile Court erred in restricting testimony, and that there was no clear and convincing evidence to support a finding that termination was in the best interest of these children. We affirm.

### Background

In February of 2005, the State filed a petition seeking to terminate Mother's parental rights to the Children. This was not the first petition that the State had filed seeking to terminate Mother's parental rights to the Children. The Juvenile Court previously had terminated Mother's parental rights to the Children and entered a judgment by default that later was set aside. The Children came into the State's custody in January of 2002. Shortly thereafter, the State removed a sixth child from Mother's custody when Mother tested positive for illegal drug use at the hospital while giving birth to this sixth child. A separate action was filed seeking to terminate Mother's parental rights to the sixth child.[1] The case at hand involves only the older five children. The oldest of the five children involved in this case currently lives in a foster home and the younger four reside with Mother's mother ("Grandmother").

Since the Children came into the State's custody in 2002, several permanency plans have been implemented. The most recent permanency plans[2] ("the Plans") required, among other things, that Mother notify the State of any changes in her life circumstances including such things as address, phone number, and employment; receive psychological counseling or treatment; obtain a parenting assessment; refrain from using illegal drugs, non-prescribed drugs, or alcohol; maintain appropriate housing; and maintain lawful employment. The Plans also required Mother to return to the child support court and have that court reassess her child support obligations because the default judgment terminating both her parental rights and her child support obligations to the Children had been set aside.

The case was tried without a jury and the proof was presented at several hearings during April, May, and June of 2005.[3] As this case involves five children, the proof was extensive. The relevant facts are the same as to each of these five children as is our analysis and application of the law.

Mother, who is 32 years old, testified that the Children were removed from her custody "[b]ased on falsified information and allegations" and that she has attempted to comply with the Plans. She testified that she lives in a two bedroom duplex that she claims is big enough for her and all six children. Mother testified that she has been living in this duplex for approximately two months. However, Mother admitted that prior to that time she was homeless for a week and during this period of home-

1. At trial, Mother testified that she has seven children, but that none of her children were in her custody at that time.

2. Individual permanency plans were created as to each child. The goals that Mother was to attain are substantially similar for each of the plans.

3. We note that the trial transcripts state that the proof was heard on August 10 and 16 of 2005. However, the pleadings, the Juvenile Court's final order, and the notice of appeal show that the proof was heard in April, May, and June of 2005. The exact dates upon which proof was heard are immaterial to the issues on appeal.

lessness, she stayed at the Extended Stay Hotel where she was working. When questioned further, Mother admitted that she stayed at the Extended Stay Hotel for three and a half months. When asked how many different places she has worked since the Children came into the State's custody, Mother testified: "I don't really have a job history, but, I've worked at Church's Chicken off and on for about eight years and housekeeping." Mother testified that the longest she has held a job has been for about seven months. She testified that she currently is working at Reid House in housekeeping. When asked about her salary, Mother stated: "Well, with child support taking half my check of whatever I make, I probably bring home, oh, $300.00. It's being paid every two weeks." Mother testified that she finished parenting classes in May of 2003. Mother testified that she has been to counseling sessions, but has not successfully completed a course of counseling. Mother admitted that there is a restraining order between her and Grandmother, but testified that she was at Grandmother's house last week. Mother testified that Grandmother invited her over and that it was Mother's understanding that the restraining order would be dropped. Mother admitted that she is not regular in her visitation with the Children.

Mother testified that she has been using marijuana "[o]ff and on since I was 18." She admitted that she still was using marijuana "[o]ff and on, yes, sir." Mother testified that she has been in several drug treatment facilities and completed the Chattanooga Endeavors program. According to Mother, the last time she used marijuana was the month before trial and she stated: "But I'm still providing, able to provide—I'm still working, taking care of my priorities." Mother claims: "It's not that I have to have [marijuana] either." Mother stated, "what I do in the streets I do not do at home." Mother admitted that she uses marijuana "[m]aybe once or twice every two to three weeks, maybe . . . . But I still take care of my priorities." She testified: "I have gotten away from Marijuana before." When asked if she smoked marijuana in October of 2004, Mother stated: "it's possible. If you have a copy of my drug screen, it's possible." When asked if she used marijuana in December, Mother again stated: "[i]t's possible, if you have a drug screen." Mother admitted that before the State took custody of the Children, she was on probation for possession of marijuana.

Mother testified that the Chattanooga Endeavors program that she completed was approximately four or five months long and included drug and alcohol treatment. Mother claims that in connection with attending the Chattanooga Endeavors program, she was off drugs for approximately six months. When asked if she considered smoking marijuana since completing the Chattanooga Endeavors program to be a relapse, Mother stated: "[i]n a bad way, no, sir." Mother stated there is a difference between a 'good relapse' and a 'bad relapse' "cause I'm not an addict, you know." Mother claims that marijuana serves the same purpose as the pills that the psychiatrist wants her to take for "[m]y depression and stress."

Mother asserted that as to her drug use, "[i]t's just a choice." Mother admitted that she went to jail for possession of narcotics, cocaine and marijuana, and further admitted that by smoking marijuana she is not obeying the law. Mother's response when asked if she is receiving treatment for her drug problem was: "[i]t's not a problem." Mother claimed that if she were able to get into a drug treatment program that she could abstain from using marijuana, but she admitted to testing positive for drugs only three

months after she graduated from the Chattanooga Endeavors program.

Susan Jakewith, a team coordinator with the Department of Children's Services, testified. Ms. Jakewith testified that she attended a permanency plan staffing for this case in July or August of 2004, and discussed with Mother:

> that she needed to have a clean drug screen from that point on. That she needed to have a job, maintain a job for six months substance consistency and employment. That she needed to cooperate with the Department, as far as letting us know if she had a change of address or anything of that nature. And that she needed a stable residence.

Ms. Jakewith testified that Mother stated she understood these requirements, but that two or three weeks later, Ms. Jakewith received a call from Mother who wanted to discuss the fact that she just had a dirty drug screen. Ms. Jakewith testified:

> On particular goals she will, you know, give us cleaned up drug screens for a couple of months or so, and then we'll have a relapse.
>
> She will get a job and maintain a job sometimes for a month or two at a time, but then, lose it.
>
> We've had a problem with maintaining housing. And the sense I get from [Mother], is that she's angry with the Department. She's frustrated with us. Because I think in her understanding, she thinks that if she attacks the—getting a clean drug screen, if she attacks the drug problem and does well on that for a period of time, then, she's finished. That's completed.
>
> And then she will attack—it's almost like she attacks her goal consecutively. And while she's working on the job part of the plan she forgets that she's got to maintain the clean drug screen part of the plan.

So our problem has been not that she just abandons the total plan, it's that we don't get a consistent effort on every part of the plan over a period of time.

Ms. Jakewith testified: "We really didn't expect for [Mother] to have a residents (sic) yet that would accommodate all four children, but that she had a stable residence where she had not moved frequently." Ms. Jakewith further testified:

> I think the Department has been fair in dealing with [Mother]. I think her anger and her frustration is over the fact that her perception of completion of a goal on the perm plan is different from what we consider completion.
>
> We don't expect—when a parent attacks a perm plan, and starts working a perm plan, our expectation is that if they choose to work on the drug portion of their per (sic) plan, and they start having ... negative drugs screens, if they're doing well, and they're having negative drug screens, our expectation is that that continues. It continues.
>
> It's not that once you've had a few negative drug screens, then I'm finished with that. And so if I use drugs after that it doesn't count, because at one time I actually was able to show that I could go without using drugs.
>
> And I think that this is where a lot of [Mother's] anger and frustration at the Department comes in.... [I]n one of my conversations when she was especially frustrated talking to me, she said, you know, but I've done this. Meaning, you know, I've had the A & D assessment, and I've had negative drug screens, and that would be true, but it would be from this point in time to this point in time.
>
> And our expectation was that it was going to be maintained from that point on.... I think, [Mother] thinks that in

her mind that she's met a lot of these goals and a lot of these expectations.

And I would agree with [Mother] that she has met any and all of the goals at some point in time, but she's had trouble maintaining it over a period of time where we had everything coming together on the plan to show stability to the Department, and that we would be in a position where we could consider returning her children.

Andrese Harper, a Case Manager 2 for the Department of Children's Services, testified. Mr. Harper testified that he has been working on this case since August or September of 2003. Mr. Harper testified that Mother has not stayed in regular contact with him as required in the Plans. Mr. Harper testified that since the beginning of 2005, Mother has not been willing to share information with him regarding such things as her employment or where she is living. Mr. Harper also testified that the only time Mother was able to show him clean drug screens was when she was finishing the Chattanooga Endeavors program. Mr. Harper testified that Mother has not had a clean drug screen in the last six months. Mr. Harper testified that since he began working on this case, Mother has not maintained a residence for more than three or four months at a time and has not shown proof of maintaining employment for more than three or four months at a time.

Mr. Harper testified that he referred Mother to Fortwood for a psychiatric consultation as required by the Plans. Mr. Harper testified that Mother attended two appointments at Fortwood and then failed to attend her next scheduled appointment. A letter was sent to Mother regarding the missed appointment requesting that Mother call Fortwood, but Mother never contacted Fortwood. When asked what efforts he had made to fix the relationship between Mother and Grandmother, Mr. Harper stated: "To fix the relationship between the Mother and the Grandmother? ... I didn't make any,...."

Robin Howard, a child and adolescent therapist at Focus Psychiatric Services who has been working with the Children since 2002, testified. Ms. Howard testified that she has a Master's Degree in Clinical Psychology and is a licensed psychological examiner. Ms. Howard explained that she received a referral from the State seeking behavioral help with the Children. Ms. Howard testified she has been working with the Children "to refocus on making better choices, school behavior, going on with their lives, instead of being involved in the turmoil of the family situation." Ms. Howard testified that she saw the Children until February 25, 2005, when Grandmother called to cancel the Children's March appointment and never rescheduled. In addition, Ms. Howard testified she no longer is seeing the oldest child and has not seen him for at least four months. Ms. Howard testified that since the oldest child no longer is living at Grandmother's house, the State requested another therapist for him.

Ms. Howard testified regarding her thoughts and impressions formed during the time she was seeing the oldest child, stating:

I think primarily he had a—felt like he had a role of responsibility for all the younger children. He was sort of in charge of taking care of their well being. He indicated to me that he had done that pretty much most of his life, that he's always been kind of in control, varying between loving his little brothers and concern for their well being versus just be feeling overwhelmed by that pressure of having that responsibility and not really wanting that responsibility.

Ms. Howard testified that during the time she was seeing the oldest child, his feelings of being responsible for his siblings did alleviate somewhat. She stated: "he felt like the Grandmother had made a great deal of effort, at least most of the time, to let the responsibility for the younger children be on her and not on him. He was given a lot less child care responsibilities, I guess, put it that way."

Ms. Howard testified that Mother did attend one of the sessions with the Children. Ms. Howard told Mother she was welcome to attend more sessions, but Mother has not done so. Ms. Howard testified that "[t]he children were aware that [Mother had used] illegal drugs." Ms. Howard testified:

> These children seem to [be] very, very, very aware of illegal substances. It's almost like it was a normal thing, they saw it a lot, but they—they have not mentioned any specific drugs that they have seen.
>
> They have just said that they don't like the way their mom acts when she's doing drugs. . . . The main concern they have is when, is that she's distanced from them, but that she's—she's either sort of angry, or not communicating effectively, meaning that she doesn't—not paying them any attention, which is tough, because these kids are fairly demanding of attention.

Ms. Howard also testified that conflict between Mother and Grandmother causes problems for the Children. Ms. Howard testified that this conflict:

> [has] been very stressful for [the Children]. When they have seen their Mother, that, she would—had told them they did not have to do anything the Grandmother said, because she was not their Mother. That she was getting them back; and therefore, whatever

their Grandmother said made no difference to them whatsoever.

Ms. Howard further testified: "One of the primary concerns that I have as a therapist is the damage that this has done, this conflict and the ongoing inconsistency of the relationship between the Mother and the Grandmother." When asked what the effect on the Children would be if the present situation were allowed to continue, Ms. Howard stated: "I think the children's behavior is just gonna continue to go downhill. It's gonna continue to be traumatic for them, living in the uncertainty not knowing what's gonna happen is very, very difficult for children."

Ms. Howard testified that if things continue as they have been the last year, with the conflict between Mother and Grandmother, the Children "would just give up and quit trying. I think the school would probably just would continue to go downhill." Ms. Howard further testified:

> [I]t's an on and off—the mom comes back, says she wants, you know, she wants to love the children. She wants to be close to her children. She wants to get along.
>
> Then, she needs money. She needs a place to stay, if something's not okay. Then there's another argument, then the mom's gone again, and the children are very, very confused when that happens.
>
> They get frustrated. They get upset. Their behavior goes downhill. They argue more with one another. Their school performance goes down.
>
> And they have got to the point in therapy where they can express—they just don't know what to do. They think about it all the time. They obsess about it in school. They can't go on with their life. And that's kind of our—our goal has been trying to get them refocus on you making good decisions for your own life. This is not a situation you can fix.

So that every time the interaction happens again, the children start taking on that responsibility of, we have to fix the situation. We have to be good. We have to be bad. We have to do something to get their attention on us and off of each other.

When asked how she knew the Children were concerned about Mother, Ms. Howard stated:

They have talked about that. One of the reasons that they have talked about at length with me, for having some additional problems, but they were always thinking about their mom, and they were always worried about their Mother. They love their Mother. They didn't want her to get hurt. They didn't want to get in trouble. They were concerned that she was not going to be okay.

There was one incident where they had visited her where she was living and there was no power on there, and they were having to—she was doing their hair, which is sort of a bonding thing that they love for her to do their hair, they were trying to do that by candlelight because there was no power in the living place. They were very worried about her well being.

Ms. Howard also testified:

I think if [the Children] were not with the Grandmother, I think there is some danger of further separation, ability to attach—difficulty with attachment. Because they are attached both with the Mother and the Grandmother. And so to sever all those attachments it's gonna be very traumatic for the children.

On the other hand, if the situation continues to be unstable, where the children still don't know where they're going, and what's gonna happen to them, I think that's destructive as well, so it's really sort of, six and one, half dozen of the other, it's a difficult choice to make.

Ms. Howard also testified she has concerns about Mother's relationship with the Children and stated:

For example, [one of the Children] said he's kind of felt like his Mother really wanted him, but not the other children, and so he was trying to separate himself from the other children, sort of a—I'm better than you are. She loves me more. There's a lot of that kind of dynamics of conflict between the children over who the Mother really wants.... It's common [in sibling relationships], but it's extreme in this situation.... The children, [except for that one], the other children feel like that mom loves the new baby and that she didn't really want them, and that's been a dynamic, an issue that we've worked on as well.

Ms. Howard testified that the Children:

[have been] very, very confused and conflicted,.... They would say that they were in school and all they could think about was there (sic) mom and what they should do. And did they have to make a choice between their Mother and their Grandmother, and how they should—what they should think, if, you know, how to take the situation. How they could make mom want them, and how they can get mom to stop doing drugs, and how they could get mom to stop being around people she was around and were afraid of.

They were scared of some of the people that were around Mother at some point. And recently they haven't been around Mother's friends, as far as I know. That's been some time ago. But they were concerned about some of the people that Mother was around from her friends that she hung out with.

Jennifer Collins, the Director of the Child Support Division of the Juvenile

Court Clerk's Office, testified regarding Mother's payment of child support. Ms. Collins testified that Mother is under an order to pay back support, but not current support. Ms. Collins testified that there are five judgments, one for each one of the Children, ranging in amount from $585 to $641. For four of these judgments, Mother last made payments in April of 2005. For the remaining judgment, Mother last made a payment in November of 2004. When asked why there was a different payment date for the one judgment, Ms. Collins stated:

I don't know why [the one] is different, but it was in November. My guess is the State—this money is going to the Child Support Receiving Unit in Nashville. My guess is they just failed to apply any monies to this case. That's my guess. I don't know if that's right. . . . I'm thinking that because there were so many different cases maybe the State did not apply it correctly.

Ms. Collins further testified: "it appears that [Mother] is under an Order for $65 per month, per case, for arrearage payments. . . . Well the last payment on most of [the five judgments] was $5.00 dollars. Some of the other payments have shown up as $30.00, $18.00 dollars, $15.00 dollars, $23.00 dollars, $10.00 dollars, $8.33." When asked about the differences in the payment amounts, Ms. Collins stated: "There is an Income Assignment in [the file] to Homestead Village. It appears that it is still being honored. My guess is, she's not making enough money to pay the entire $65.00 dollars." When asked to use one of the judgments as representative, Ms. Collins testified that Mother made nine payments on that judgment between January 8, 2004, and April 22, 2005. Specifically, Ms. Collins testified that in regard to that one judgment, Mother made one payment in January of 2004, two in

October of 2004, two in November of 2004, and two payments each in March and April of 2005.

Grandmother also testified. She testified that the four younger children currently live with her and her own two teenage children. When asked about why the Children were removed from Mother's custody, Grandmother stated:

My understanding of why they came into State custody in the first place is due to the fact that she did not appear in Court, because Judge Catanzero wanted to see her.

Because she and I had a Power of Attorney, a Temporary Custody Agreement, and her children were—[one of them] was suspended continuously from school, and [another one of the Children] was not in school, because he didn't have birth certificate.

And the Orchard Knob Middle School Principal and staff refused to accept the Power of Attorney that I had, they said I had to bring it to court and get it stamped.

Grandmother also was questioned regarding an Order of Protection she obtained against Mother. Grandmother stated she obtained the order: "Because I thought I was gonna have to have surgery, and I thought I was gonna have to give her children up, and she always felt I was the reason why her children were in State custody, and I did not want to have a confrontation." When asked if she thought the State was helping to reunite Mother with the Children, Grandmother stated: "DCS has worked towards unification. . . . They've allowed her, what, eight perm plans."

The Juvenile Court entered a Termination of Parental Rights and Final Decree of Guardianship order on July 5, 2005, finding and holding, *inter alia,* that clear

and convincing evidence existed to terminate Mother's parent rights based upon the three separate grounds for termination found in Tenn.Code Ann. §§ 36–1–113(g)(1), (g)(2), and (g)(3).

The Juvenile Court made detailed and specific findings including the following:

a. The subject Children have been in the custody of [their grandmother] for at least six (6) months, specifically since removal from the mother's custody on January 18, 2002.

b. The Department made reasonable efforts to prevent the children's removal. At the time of the removal, the family's home had no water or electricity. [Mother] had been denied further use of food stamps, and had no other means to provide food for the Children. [Mother] did not return telephone calls made by the Department in order to provide services to help her establish a safe home for her family. At the time of the adjudicatory hearing in this matter, [Mother] was incarcerated.

c. The Department made reasonable efforts to assist [Mother] to establish a suitable home for the Children for a period of more than four (4) months following the removal on January 18, 2002. A wide range of services were offered, but she failed to achieve sufficient stability and maintain it for a suitable period of time for the Department and the Court to be able to return the Children to her care.

d. [Mother] failed to substantially comply with the requirements set forth in the foster care plans prepared for her following a finding by this Court that the Children were dependent and neglected. The requirements of the plans were reasonable and directly related to and aimed at relieving the conditions which necessitated foster care placement and were adopted by the Court.

[Mother] was required to obtain an alcohol and drug assessment, follow all recommendations of the assessment and provide random drug screens. This requirement was reasonable because of her history of incarceration for drug charges and allegations made regarding her continuing use of illegal drugs. It was an especially important requirement because the Children were aware of and concerned about their mother's safety due to her drug use and association with other drug users.

After failing to complete the drug treatment programs offered by CADAS and Bradford Health Services, [Mother] completed a drug treatment program and an aftercare program through Chattanooga Endeavors. However, she testified during this hearing that she continues to use drugs at this time. [Mother] testified that she made a choice to use drugs again after completion of the Chattanooga Endeavors program. When asked if she has sought any other treatment for the problem since her relapse, she stated that "it's not a problem." In her opinion her ongoing drug use does not affect her ability to do what she needs to do for her family. She testified that "what I do in the streets, I don't do at home," and that "coming home high wouldn't prevent me from taking care of my priorities."

[Mother] testified that she uses marijuana to "self-medicate" for her mental health problems. She has been offered psychological and psychiatric assistance by the Department, but has not taken advantage of the services. [Mother] stated that she is afraid to take the pills that the psychiatrist wanted to prescribe and that marijuana serves the same purpose.

[Mother] has been told repeatedly by the Court and the Department that in order to regain custody of the Children she must stop using illegal drugs. She admitted that she has known for three years that everyone has wanted her off drugs. [Mother] denied having a drug problem. Quite the contrary, she testified that she is not addicted to drugs, but that she freely chooses to use marijuana.

During examination by the Department's counsel and cross-examination by the Guardian *ad litem*, she was adamant to the point of being verbally combative with counsel and the Court in her testimony that the use of marijuana is her choice and that it does not affect her ability to be a good parent. [Mother's] priorities are out of order. She has chosen drugs over her children despite knowing that the Children worry about her safety and well-being because of her drug use and her association with other drug users.

e. [Mother] was aware of the requirements of the permanency plans prepared for her. She signed and indicated that she agreed with the plans that were adopted on February 2, 2003. The requirements of all plans prepared for her were consistent and focused on successful drug and mental health treatment, discontinuing the use of illegal drugs, and establishing a safe and sustainable home for the Children.

f. [Mother] willfully abandoned the Children within the meaning of the law. Specifically, she has made only token payments of child support during the four (4) months preceding filing of the petition in this matter despite her testimony that she was employed during that time, sometimes working two jobs.

* * *

g. The conditions which led to the removal persist or other conditions exist which in all probability would cause the Children to be subjected to further abuse and neglect, thus preventing the Court from giving the Children over to the care and custody of [Mother]. Specifically, she is still unable and unwilling to provide a suitable drug-free home environment where the Children can safely live and develop free of worry about their mother's drug use, acquaintances with other drug users, and her welfare as well as their own.

The Juvenile Court further found and held that it was in the best interest of the Children for Mother's parental rights to be terminated. The Juvenile Court made specific and detailed findings supporting its best interest analysis including:

a. [Mother] loves the Children, but she does not have a significant parent-child relationship with them. She has depended on her mother to provide for them throughout their lives. Her relationship with the Children is much more like that of an older sibling than a parent.

The Children's therapist testified that the Children were always worried about their mother. They didn't want her to get hurt. Also, the Children expressed worry about their mother after visiting her once when there was no electricity.

[The oldest child] told his counselor that he wished his mother would quit lying about her drug use. He also said that he felt that he was responsible for caring for the other Children. He told her that he was overwhelmed by that responsibility and pressure.

The Children's therapist testified that the primary goal of their therapy was to help them to understand that they were not responsible for fixing their mother. She told the Children's grandmother

and the Department that she would be happy to include the Mother in the Children's therapy. She told the Mother during the one session in which she participated that she would be happy to see her and include her in the Children's therapy and gave her the schedule. The Mother chose not to participate.

b. Continuation of the parent and child relationship greatly diminishes the Children's chances of early integration into a stable and permanent home. The younger Children are adoptable at this time. [The oldest child] is doing well in his current foster care placement and it is anticipated that will become a permanent placement for him. The likelihood that successful permanent placements can be found for the Children diminishes as the children grow older and as the amount of time spent in foster care increases.

c. [Mother] continues to use illegal drugs despite having been told repeatedly by the Department and the Court that her drug use is the major barrier to reunification with her children. Based upon the testimony of the Children's therapist, they are aware of and concerned about her continuing drug use. [Mother] is aware that the Children are concerned about her ongoing drug use and association with other drug users. She believes that using drugs is her choice and that it does not affect her ability to parent her Children. Clearly, she has no intention of stopping illegal drug use in order to regain custody of her children.

d. There is a long history of conflict between [Mother] and her mother. The Children's therapist testified that this conflict has a profound negative effect on the wellbeing of the Children. [Mother] has been told that the sometimes acrimonious relationship she has with her mother is a barrier to her children's wellbeing, but she has demonstrated no effort to change the relationship.

e. [Mother] repeatedly testified that she bears absolutely no responsibility for the Children being in the custody of the Department. The Children were initially removed from [Mother's] custody because her home had no water or electricity, she had no means to obtain food for the children, and they were at times living in her van. At the time of the preliminary hearing, her whereabouts were not known and she was a fugitive from the law. However, despite this being a matter of record in this court, she blamed her mother for placing the Children in the Department's custody. [Mother's] version of the way the Children came into custody is that she did what any good mother would do when faced with incarceration and gave her mother power of attorney to care for the Children. She then accused her mother of giving custody of the Children to the State for some reason.

More than three and one-half years after the Children were removed from her custody, [Mother] accepts no responsibility for them being in the custody of the Department. She is adamant in her statements that she bears no fault for the fact that none of her six children are in her custody. It is always someone else's fault. Given that this is her state of mind, it is inconceivable that she would ever do what is required in order to regain custody of the Children.

f. [Mother's] behavior speaks more loudly that (sic) her words. She professed love for the Children and asked the Court to return them to her custody. However, it is abundantly clear from her behavior and lack of effort to effect lasting change that she loves using drugs

and engaging in conflict with her mother more than she loves the Children.

Mother appeals the Juvenile Court's July 5, 2005 order terminating her parental rights.

### Discussion

Although not stated exactly as such, Mother raises three issues on appeal: 1) whether the Juvenile Court erred in finding clear and convincing evidence to support the grounds for termination; 2) whether the Juvenile Court erred in restricting testimony at the hearing; and, 3) whether the Juvenile Court erred in finding clear and convincing evidence to support a finding that termination is in the best interest of the children.

The factual findings of the Juvenile Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R.App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn.2001). As discussed by this Court in *In re Adoption of T.A.M.,* No. M2003–02247–COA–R3–PT, 2004 WL 1085228, 2004 Tenn.App. LEXIS 317 (Tenn.Ct.App. May 12, 2004), *no appl. perm. appeal filed:*

> Because of the heightened burden of proof required by Tenn.Code Ann. § 36–1–113(c), we must adapt Tenn. R.App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R.App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett,* 92 S.W.3d at 838; *In re Valentine,* 79 S.W.3d at 546; *Ray v. Ray,* 83 S.W.3d at 733; *In re L.S.W.,* 2001 Tenn.App. LEXIS 659, No. M2000–01935–COA–R3–JV, 2001 WL 1013079, at *5 (Tenn.Ct.App. Sept.6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re Adoption of T.A.M.,* 2004 Tenn.App. LEXIS 317, at **8–9, 2004 WL 1085228, at **3-4.

In *Dep't of Children's Servs. v. D.G.S.L.,* this Court discussed the relevant burden of proof in cases involving termination of parental rights. Specifically, we observed:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon,* 776 S.W.2d 96, 97 (Tenn.Ct. App.1988) (citing *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).
>
> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn.Code Ann. § 36–1–113(c). Before a parent's rights can be terminated, it must be shown that the parent

is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn.1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn.Ct.App.1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn.Code Ann. § 36–1–113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001–00742–COA–R3–JV, 2001 Tenn. App. LEXIS 941, at **16–17, 2001 WL 1660838, at **4-5 (Tenn.Ct.App. Dec.28, 2001), *no appl. perm. appeal filed.*

Termination of parental rights may be based upon a number of statutory grounds. The statutory provisions relied upon by the Juvenile Court in the present case provide that parental rights can be terminated for the following reasons:

(1) Abandonment by the parent or guardian, as defined in *§ 36–1–102*, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn.Code Ann. §§ 36–1–113(g)(1), (g)(2), and (g)(3) (2005). As pertinent to this appeal, 'abandonment' is defined as:

For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn.Code Ann. § 36–1–102(1)(A)(i) (2005).

 The Juvenile Court found there was clear and convincing evidence that the statutory grounds for termination in Tenn. Code Ann. §§ 36–1–113(g)(1), (g)(2), and (g)(3) had been met. Clear and convincing evidence supporting any single ground will support a termination order. *See In re Valentine*, 79 S.W.3d 539, 546 (Tenn.2002).

Mother argues, in part, that there is no clear and convincing evidence to support a termination of her parental rights because the record indicates that the State did not make reasonable efforts to reunite her with the Children. As reflected in the extensive factual proof presented at trial and as detailed in this Opinion, such simply is not the case.

 The State "must make reasonable efforts to preserve a family before seeking

to terminate parental rights." *In re: Jeremy D. and Nathan D.*, No. 01–A–01–9510–JV–00479, 1996 Tenn.App. LEXIS 292, at \*\*7–8, 1996 WL 257495, at \*3 (Tenn.Ct.App. May 17, 1996), *no appl. perm. appeal filed.* However, "[r]eunification of a family is a two-way street, and the law does not require DCS to carry the entire burden of this goal." *In re: R.C.V. and O.V.*, No. W2001–02102–COA–R3–JV, 2002 Tenn.App. LEXIS 811, at \*39, 2002 WL 31730899, at \*11 (Tenn.Ct.App. Nov.18, 2002), *no. appl. perm. appeal filed.*

◼ While there was a finding in this case by the Juvenile Court in December of 2004, that the State was not making reasonable efforts to achieve permanency on behalf of the Children, the State made additional efforts after that time. More importantly, the evidence clearly shows that despite the reasonable efforts of the State, Mother has chosen to continue to use illegal drugs, and has refused to seek drug treatment, even though her drug use and its effects on her and the Children were the main obstacles to reuniting Mother with the Children. In addition, Mother chose to stop attending the psychological counseling that the State arranged for her at Fortwood. In addition, Mother has chosen to move frequently, sometimes remaining homeless for months at a time without seeking help or even notifying the State of her whereabouts to give them the chance to help. Mother understood what was required of her under the Plans, and made conscious choices to continue to use drugs and not avail herself of the assistance offered by the State. The Juvenile Court made specific findings that the State had made reasonable efforts to reunite Mother with the Children. The evidence does not preponderate against these findings. After a careful review of the record, we find that the facts clearly and convincingly establish that the State made reasonable efforts, in light of all the circumstances, to reunite Mother with the Children.

◼ We next discuss whether the Juvenile Court erred when it concluded there was clear and convincing evidence that Mother had abandoned the Children as defined in Tenn.Code Ann. § 36–1–102 by willfully failing to support or willfully failing to make reasonable payments toward the support of the Children. The evidence shows that the petition to terminate Mother's parental rights to the Children was filed on February 16, 2005. Thus, the relevant four month period would have been from November 15, 2004, through February 15, 2005. The evidence shows that Mother made child support payments in November of 2004, but made no payments during the months of December of 2004, January of 2005, and February of 2005. Mother, however, testified that she had worked steadily during this time period. In addition, the Plans required Mother to return to the child support court to have that court reassess her child support obligations, and Mother never did so. The evidence does not preponderate against the Juvenile Court's factual findings relative to this issue, and we conclude that the Juvenile Court did not err when it held that there was clear and convincing evidence that Mother had abandoned the Children as defined in Tenn.Code Ann. § 36–1–102.

◼ We next discuss whether the Juvenile Court erred when it concluded that there was clear and convincing evidence that Mother had failed to substantially comply with the statement of responsibilities in the permanency plans. The evidence shows that under the Plans, Mother was to notify the State of any changes in her life circumstances including such things as address, phone number, and employment; receive psychological counseling or treatment; obtain a parenting assess-

ment; refrain from using illegal drugs, non-prescribed drugs, or alcohol; and maintain appropriate housing and lawful employment. Mother also was required to return to the child support court to have her child support obligations reassessed.

Mother claimed that she complied with the responsibilities in the Plans, but the evidence shows otherwise. For example, Mother testified that she has been living in a duplex for approximately two months, but admitted upon further questioning that prior to that time she was homeless and staying at the Extended Stay Hotel where she was working. Mother admitted that she stayed at the Extended Stay Hotel for three and a half months. When asked how many different places she has worked since the Children came into the State's custody, Mother testified: "I don't really have a job history, but, I've worked at Church's Chicken off and on for about eight years and housekeeping." Mother testified that the longest she has held a job has been for about seven months. In addition, Mother testified that she has been to counseling sessions, but has not successfully completed a course of counseling. Also, Mother never returned to the child support court to have her child support obligations reassessed.

Mr. Harper, who has been the case manager for this case since the fall of 2003, testified that Mother has not stayed in regular contact with him as required in the Plans, and that since the beginning of 2005, Mother has not been willing to share information with him regarding such things as her employment or where she is living. Mr. Harper testified that since he began working on this case, Mother has not maintained a residence for more than three or four months at a time and has not shown proof of maintaining employment for more than three or four months at a time. Mr. Harper testified that he re-

ferred Mother to Fortwood for a psychiatric consultation and that Mother attended only two appointments at Fortwood. Mother failed to attend her next scheduled appointment. Mr. Harper testified that a letter was sent to Mother regarding the missed appointment requesting that Mother call Fortwood, but Mother never contacted Fortwood. Mr. Harper also testified that the only time Mother was able to show him clean drug screens was when she was finishing the Chattanooga Endeavors program. Mr. Harper testified that Mother has not had a clean drug screen in the last six months.

Although Mother did complete the Chattanooga Endeavors program and remain drug-free for a short period of time, Mother admitted that she resumed using marijuana and still is using marijuana "[o]ff and on, . . . ." Mother testified that the last time she used marijuana was the month before trial and that she uses marijuana "[m]aybe once or twice every two to three weeks, maybe, . . . ." Mother testified that she does not consider her use of marijuana since completing the Chattanooga Endeavors program to be a relapse "cause I'm not an addict, you know." Mother insisted that her drug problem is "not a problem," and that her use of marijuana is "just a choice." Mother refused to acknowledge that her drug use is a problem or that she needs to seek help and remain drug-free.

The evidence shows that Mother has made attempts to comply with the Plans, but has failed to make consistent attempts and has failed to achieve any stability in housing or employment. The requirements of the Plans were in place to achieve one ultimate goal: for Mother to provide a safe and stable environment to properly raise the Children. In addition, the evidence shows that Mother has failed to refrain from using illegal drugs. Mother testified that she is not an addict, but

rather she, in her words, simply chooses to use illegal drugs. Mother has refused to acknowledge that her drug use is a problem. Instead, Mother insisted that her drug use was her choice and had nothing whatsoever to do with how she handled her priorities. Clearly, Mother's priorities are skewed as she has chosen drugs over the Children. The evidence does not preponderate against the Juvenile Court's factual findings relative to this issue, and we conclude that the Juvenile Court did not err when it held that there was clear and convincing evidence that Mother had substantially failed to comply with the statement of responsibilities in the permanency plans.

■ We next address whether the Juvenile Court erred in concluding there was clear and convincing evidence to support the termination of Mother's parental rights based upon Tenn.Code Ann. § 36–1–113(g)(3). The evidence shows that the Children have been removed from Mother for a period of well over six months, that the conditions which led to the removal still persist, there is little likelihood that these conditions will be remedied at an early date, and that the continuation of the relationship between Mother and the Children greatly diminishes the Children's chances of early integration into a safe, stable and permanent home. As discussed above, Mother has failed to maintain any stability in housing or employment. Mother continues to use illegal drugs and refuses to acknowledge that her drug use is a problem. After considering the record as a whole, we hold that the Juvenile Court did not err when it concluded there was clear and convincing evidence to terminate Mother's parental rights pursuant to Tenn.Code Ann. § 36–1–113(g)(3). The Juvenile Court's judgment on this issue is, therefore, affirmed.

■ We next consider the issue of whether the Juvenile Court erred in restricting testimony at the hearing. We are a bit puzzled as to why Mother raises this as an issue as the record reveals that Mother apparently waived this issue at trial. We illustrate by quoting a portion of the trial transcript containing a conversation between the Juvenile Court and Mother's attorney.

THE COURT: Now, back to what you're wanting to do. What I had before me at the time you requested a recess was a motion to him as to exclusion, for relevancy. He believes that— or was going back, and some of this was predated the first termination was not relevant for this up-to-date petition. How do you wish to respond? (sic)

MS. WELSH: I'm willing to proceed at this time without bringing in evidence from the previous termination.

In addition, we note that although Mother's appellate brief raises this as an issue and claims that by restricting testimony the Juvenile Court violated Mother's constitutional right to due process, Mother cites to nothing in the record and to no authority other than making a vague reference to the 14th Amendment of the United States Constitution. We find no error in the Juvenile Court's restricting testimony regarding the grounds for termination to the time period after the prior termination proceedings. We note that the Juvenile Court specifically stated it was doing this to benefit Mother. Specifically, at trial the Juvenile Court stated:

Now, I'm kind of back to moving past that termination though, giving her a fresh start, which is what I did when I dismissed it last time, because they didn't have all their records. [Mother] was the beneficiary of that. So I thought we were gonna go back and just confine it to that most recent plan, . . . .

In addition, we find no error in the Juvenile Court's consideration of all available evidence in deciding what was in the best interest of the Children. We find Mother's issue regarding the Juvenile Court's restricting testimony to be without merit.

■ Finally, we consider whether the Juvenile Court erred in finding clear and convincing evidence to support a finding that termination is in the best interest of the children. Tenn.Code Ann. § 36–1–113(i) describes the standard for determining whether termination is in the best interests of the child in such cases:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36–5–101.

Tenn.Code Ann. § 36–1–113(i) (2005).

■ Since the best interest determination requires a separate analysis, the existence of grounds to terminate parental rights does not automatically mean that termination of parental rights is in the best interest of the child. *See, e.g., In re D.I.S.*, No. W2000–00061–COA–R3–CV, 2001 Tenn.App. LEXIS 358, 2001 WL 523956 (Tenn.Ct.App. May 17, 2001), *no appl. perm. appeal filed.* From the record before us, Mother has not made an adjustment of circumstances or conditions such that it would be safe for the children to be returned to her. DCS clearly has made a reasonable effort to assist Mother, but Mother has failed to make a lasting adjustment. After considering all relevant statutory factors in light of the evidence presented at trial, we do not believe the Juvenile Court committed reversible error when it concluded that clear and convincing evidence established it was in the best

interest of the Children to terminate Mother's parental rights.

### Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. Exercising our discretion and as Mother is indigent, the costs on appeal are assessed against the Appellee, the State of Tennessee, Department of Children's Services.