IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JULY 23, 2009 Session

STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v.
AMBER NICOLE BENNETT

IN THE MATTER OF:
B.P.B. d/o/b 4/12/04
K.L.B. d/o/b 4/12/04

Direct Appeal from the Juvenile Court for Shelby County
No. S-5281      Curtis Person, Judge

No. W2008-02391-COA-R3-PT - Filed October 8, 2009

This is an appeal from an order terminating a mother's parental rights on the ground of substantial noncompliance with a permanency plan, among others. The trial court found that termination was in the children's best interest. The mother appeals, and we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Shantell S. Suttle, Cordova, TN, for Appellant

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Douglas Earl Dimond, Senior Counsel, Nashville, TN, for Appellee

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Amber Bennett ("Mother") gave birth to twin daughters, B.P.B. and K.L.B., on April 12, 2004, at the age of thirty-two. Mother was unmarried but resided with the children's father. On or about August 20, 2006, when the children were two years old, the Tennessee Department of Children's Services ("DCS") received a referral alleging that the children were exposed to drugs and environmental neglect. While at Mother's home responding to a call, police officers had reportedly found the children alone with a babysitter who did not know Mother's whereabouts or anything about the family. The babysitter did not even know the children's names. It was also reported that drug paraphernalia, including uncapped needles, were discovered in Mother's home, and bloody towels and cat feces littered the floor. The children were taken from the home by the police officers and placed in the temporary custody of DCS. The children were subsequently placed in a foster home.

On September 11, 2006, DCS developed a permanency plan for the children. Mother participated via telephone.[1] The stated goal of the permanency plan was "reunify with parent(s)" or "exit custody to live with relative(s)." The plan set a target date for accomplishing this goal within one year. Mother was allowed supervised visitation with the children, and the plan required her to make herself available for such visitation. In addition, the plan provided that Mother needed to complete a drug treatment program, have a mental health assessment performed, obtain a stable place of residence and stable employment, and develop a support system.[2] The juvenile court approved the permanency plan on October 31, 2006.

On or about December 7, 2006, Mother had her first visit with the children since they entered DCS custody on August 20.[3] During the visit, the DCS case manager, Kandis Saulsberry, explained the criteria and procedures for terminating parental rights to Mother, and Mother signed a document acknowledging that she had received the explanation and a copy of the criteria.

On January 12, 2007, the juvenile court adjudicated both children dependent and neglected. Mother did not appear at the hearing, but her appointed attorney was present. The court's order states that Mother had outstanding felony charges.

According to DCS records, Mother was a fugitive from December 2006 until June 2007. Mother had an extensive criminal record, including charges of felony theft, forgery, possession of

---

[1] It is not clear why Mother participated via telephone. Ms. Saulsberry testified that Mother was "incarcerated over the weekends" and "in and out of jail" around the time that the children entered DCS custody.

[2] Mother was evicted from her residence after the children were removed. She was also unemployed.

[3] Although Ms. Saulsberry testified at trial that Mother's first visit occurred on December 11, 2006, she also stated that Mother signed the criteria for terminating parental rights during that visit, and the date beside the signatures on the document reads December 7, 2006.

marijuana, possession of cocaine with intent to sell, and aggravated burglary. At some point, she was ordered by a court to enter a rehabilitation program and was placed on probation for ten years. Mother entered a one-year drug treatment program in July 2007. On August 12, 2007, the children's foster mother took them to the rehabilitation center to visit Mother. This was Mother's second visit with the children since they entered DCS custody in August of 2006. Mother left the rehabilitation program shortly thereafter.

On September 20, 2007, a revised permanency plan was developed, as one year had elapsed since the first plan was entered. Mother did not participate in the development of this permanency plan, and the plan stated that Mother was "on the run from the law and if she is captured she will serve prison time." The permanency goal for the children was changed to "adoption" or "exit custody to live with relative(s)," and the target date for achievement of this goal was set at six months. Despite the goal change, Mother was still required to maintain contact with DCS, schedule visitation with the children, obtain stable housing and employment, develop a support system, complete a drug treatment program, and submit to random drug screenings.

Mother was incarcerated in October of 2007. The court approved the revised permanency plan on October 30, 2007, noting that the previous plan's goal of "return to parent" was no longer appropriate due to Mother's incarceration. The court also noted that Mother had only visited with the children twice during the fourteen months that they had been in DCS custody.

On December 21, 2007, DCS filed a petition to terminate Mother's parental rights on the grounds of abandonment, failure to substantially comply with the permanency plans, and persistence of conditions. At trial, on August 15, 2008, only three witnesses testified – the children's foster mother, Ms. Saulsberry from DCS, and the children's father.[4] Mother did not present any proof. The court entered an order on September 18, 2008, terminating Mother's parental rights on the grounds of abandonment and substantial noncompliance with the permanency plans. The court found insufficient evidence to support the ground of persistent conditions. Mother timely filed a notice of appeal.

## II. ISSUES PRESENTED

Mother presents the following issues on appeal:

1.  Whether there is clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights based on substantial noncompliance with the permanency plan.
2.  Whether there is clear and convincing evidence that Mother abandoned her children by willfully failing to visit.
3.  Whether there is clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children.

---

[4] The children's father's parental rights were also terminated in these proceedings, but he has not appealed.

DCS presents the following additional issue:

4.      Whether the trial court erred in not finding that Mother had failed to remedy the persistent conditions in her life that prevented her children's return to her at an early date.

For the following reasons, we affirm the decision of the trial court.

### III.   STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005).  Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute.  *Id.*  A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination."  *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things."  *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653.  First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g).  *Id.*  Second, they must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i).  *Id.*  Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence.  *Id.* at 860-61.  In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest."  *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)).  Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)).  It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established.  *In re Audrey S.*, 182 S.W.3d at 861.

Because of the heightened burden of proof in parental termination cases, on appeal, we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861.  First, we review each of the trial court's specific factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it.  *Id.*  Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights.  *Id.*  Whether a statutory ground has been

proven by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Substantial Noncompliance

Several grounds for termination are listed in Tennessee Code Annotated section 36-1-113(g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights, *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004), provided that termination is in the best interest of the child. *In re Audrey S.*, 182 S.W.3d at 862. One ground at issue in this case, listed in subsection (g)(2), authorizes the termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" The term "substantial noncompliance" is not defined by the termination statute, but the use of the word "substantial" requires that the parent's noncompliance be "[o]f real worth and importance." *In re Valentine*, 79 S.W.3d at 547 (quoting *Black's Law Dictionary* 1428 (6th ed. 1990)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007) (quoting *In re M.J.B.*, 140 S.W.3d at 643). In addition, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy were reasonable and related to remedying the conditions which necessitated foster care placement. *In re R.L.F.*, 278 S.W.3d at 312 (quoting *In re Valentine*, 79 S.W.3d at 547). This may include conditions related both to the child's removal and to family reunification. *In re Valentine*, 79 S.W.3d at 547.

Mother argues on appeal that "there is no clear and convincing evidence that [she] had not substantially complied with the permanency plan." Again, the permanency plans required Mother to visit the children, obtain stable housing and employment, develop a support system, complete a drug treatment program, submit to random drug screens, and have a mental health assessment performed. We note that Mother does not contend that her responsibilities under the permanency plan were unreasonable. The trial court found that Mother's obligations and responsibilities outlined in the permanency plans were "reasonable and related to the reasons necessitating foster care."

As evidence of her compliance with the permanency plans, Mother points to the fact that she participated in two months of inpatient drug treatment. However, considering the fact that the program required one year of treatment, she clearly failed to comply with the permanency plan's requirement that she "complete a drug treatment program." (emphasis added). Mother's attorney stated during closing arguments that Mother had completed a drug treatment program in jail. However, no proof was presented to substantiate her statement. Statements made by attorneys are not evidence. *Houston v. Houston*, No. W2002-02022-COA-R3-CV, 2003 WL 22326970, at *10 (Tenn. Ct. App. May 29, 2003). Ms. Saulsberry testified at trial that DCS had no record of Mother completing any drug or alcohol treatment program.

-5-

Mother also claims that DCS failed to use reasonable efforts to assist her with visitation because no one brought her children to the jail to visit her after she was incarcerated in October of 2007. Mother notes that she sent a letter to Ms. Saulsberry after she was incarcerated, and that Ms. Saulsberry failed to respond. At trial, Ms. Saulsberry acknowledged that she received a letter from Mother in which Mother stated that she was incarcerated and did not want her children to be adopted. However, Ms. Saulsberry also testified that Mother did not call or write to set up visitation, and Mother presented no proof to the contrary. Mother then notes that her jail counselor contacted Ms. Saulsberry about inmate visitation. Ms. Saulsberry testified that a counselor did contact her approximately three months prior to trial regarding visitation, and that she returned the counselor's phone call, but the counselor never responded. Ms. Saulsberry testified that the DCS team did not feel that visitation at the jail was appropriate, but that visitation could possibly have been arranged if the counselor would have responded to her message.

DCS has an affirmative duty to make "'reasonable efforts' to preserve, repair, or restore parent-child relationships whenever reasonably possible." *In re R.L.F.*, 278 S.W.3d at 313 (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 (Tenn. Ct. App. Mar. 9, 2004)). However, DCS "does not have the sole obligation to remedy the conditions that required the removal of the children from their parents' custody." *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006). When reunification of the family is a goal, the parents share responsibility for addressing the conditions that led to removal. *Id.* Reunification is a "two-way street," and the law does not require DCS to carry the entire burden of this goal. *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). If parents desire the return of their children, they must also make "reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519 (citing *State Dep't of Children's Servs. v. B.B.M.*, No. E2004-00491-COA-R3-PT, 2004 WL 2607769, at *7 (Tenn. Ct. App. Nov. 17, 2004); *In re C.M.M.*, 2004 WL 438326, at *7; *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002)).

"Reasonable efforts" by DCS means "the exercise of reasonable care and diligence ... to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2005). In making such reasonable efforts, "the child's health and safety shall be the paramount concern." *Id.* What is "reasonable" depends on the circumstances of each case, but the factors that courts use to determine the reasonableness of DCS's efforts include:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519 (citing *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *9 (Tenn. Ct. App. Aug. 3, 2005); *State Dep't of Children's Servs. v. B.B.M.*, 2004 WL 2607769, at *6; *In re C.M.M.*, 2004 WL 438326, at *7). We must determine whether DCS presented "sufficient evidence regarding its reunification efforts to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances." *In the Matter of J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 (Tenn. Ct. App. June 30, 2005) (citing *In re C.M.M.*, 2004 WL 438326, at *8).

Considering all the circumstances of this case, we conclude that DCS's efforts were reasonable and Mother's were not. Ms. Saulsberry testified that DCS offered Mother referrals for drug and alcohol treatment, provided her with information regarding the mental health assessment, provided her with housing information, and attempted to arrange visitation.[5] Mother failed to show up at one scheduled visit, and she cancelled another visit. DCS supervised one visit at the drug rehabilitation center. Ms. Saulsberry explained that DCS was hindered in its attempts to further assist Mother due to the fact that her whereabouts were unknown for months at a time. Ms. Saulsberry testified that she attempted to contact Mother through one of Mother's friends on numerous occasions, but she was unsuccessful. When DCS finally learned Mother's whereabouts, she was incarcerated. We have previously recognized that DCS may be limited in the services it can provide to a parent when the parent is repeatedly incarcerated. *See, e.g.*, *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *9 (Tenn. Ct. App. Apr. 30, 2009). Such is the case here. Even if Mother expressed a desire to visit with her children after she was incarcerated in October 2007, she failed to substantially comply with the permanency plan's visitation requirement during the year prior to her incarceration. Between August 2006 and October 2007, Mother had only two two-hour visits with the children. In addition, Mother failed to comply with every other requirement of the permanency plans. She did not obtain stable housing or employment, develop a support system, complete a drug treatment program or mental health assessment, or even maintain contact with DCS.

From our careful review of the record, we conclude that DCS used reasonable efforts to assist Mother, under the circumstances, yet she failed to substantially comply with the permanency plans. Thus, grounds existed for the termination of her parental rights. We need not address the other grounds alleged by DCS.

### B. Best Interest

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App.

---

[5] DCS provided other services to the children, such as assessments for developmental delays, and it also obtained ICPC evaluations for possible placement of the children with Mother's relatives in two other states.

2005).  Tennessee Code Annotated section 36-1-113(i) provides a list of some factors to consider in determining whether termination of parental rights is in the best interest of the child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

We must determine the child's best interest from the child's, rather than the parent's, perspective. ***In re Marr***, 194 S.W.3d at 499.

Having reviewed the aforementioned factors and the entire record in this case, we readily conclude that termination of Mother's parental rights is in the children's best interest. Mother clearly has not adjusted her circumstances or conduct as to make it safe and in the children's best interest to reside with her.  Mother is currently incarcerated.  Although Mother's attorney reported that she would be eligible for parole soon, even if Mother is paroled, she has not maintained stable housing or employment in several years.  In addition, there was evidence that the children suffered from neglect while in Mother's care.  Ms. Saulsberry and the children's foster mother testified that the children were covered in flea bites and head lice when they entered DCS custody and that their condition required treatment for over a month.  The children's father admitted that he and Mother were using cocaine and syringes in the home, and that he was also selling drugs.  The foster mother testified that when the children came to live with her, they were unable to talk, had problems eating, and did not know what shoes were.  She also testified that the children were "scared to death" when

left in a room alone. She testified that the children were doing well at the time of trial, and that they had learned the alphabet and some numbers. However, she said the children still had some issues about being alone. Ms. Saulsberry said the children had "blossomed" in the care of their foster mother.

Mother had failed to maintain visitation or contact with the children since they entered DCS custody in 2006. Mother did not financially support the children or send letters, with the exception of a card on their fourth birthday, after the termination petition was filed. She had visited with the children for only four hours over the two-year period, and Ms. Saulsberry and the children's foster mother both testified that the children did not recognize Mother during their two visits with her. Ms. Saulsberry explained that when Mother approached the children and tried to pick them up, the children began crying and moved away from her. Ms. Saulsberry and the foster mother both testified that the children had no bond with Mother and referred to their foster mother as "Mommy." The foster mother wished to adopt the children, and Ms. Saulsberry stated her opinion that removing the children from the foster home would have a detrimental effect on them.

In sum, we find clear and convincing evidence to support the trial court's conclusion that termination of Mother's parental rights is in the children's best interest.

## V. Conclusion

For the aforementioned reasons, we affirm the decision of the trial court. Costs of this appeal are assessed against Amber Bennett, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.