IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 11, 2012

## IN THE MATTER OF: JUSTIN K. C. ET AL.

**Appeal from the Juvenile Court for Davidson County**
**No. PT142606      Betty Adams Green, Judge**

---

**No. M2012-00679-COA-R3-PT - Filed July 31, 2012**

---

The parental rights of the parents of three children were terminated on two statutory grounds, persistence of conditions pursuant to Tennessee Code Annotated § 36-1-113(g)(3), and substantial noncompliance with the permanency plan pursuant to Tennessee Code Annotated § 36-1-113(g)(2), and the finding that termination of their parental rights was in the children's best interests. Both parents appeal contending the trial court erred in finding any ground existed for termination and that termination of their parental rights was in the children's best interests. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

David R. Grimmett, Nashville, Tennessee, for the appellant, Michelle P.

Dennis L. Nordhoff, Franklin, Tennessee, for the appellant, Orlando P.

Robert E. Cooper, Jr., Attorney General and Reporter, and Joshua Davis Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Kelli Barr Summers, Brentwood, Tennessee, Guardian ad Litem.

### OPINION

The Department of Children's Services (DCS) filed a petition on May 13, 2011, in the Davidson County Juvenile Court to terminate the respective parental rights of Michelle P., Orlando P., and Joseph F. to three minor children. Michelle P. is the mother of all three children. Orlando P. is Michelle's husband and the father of the two younger children. Joseph

F. is the biological father of the oldest child. The children are Justin C., Amelia P., and Yavonne P. Justin C. was born to Michelle C. (now Michelle P.) on June 11, 2002. No father is listed on Justin's birth certificate but Joseph F. was subsequently determined to be the biological father of Justin. Michelle C. later married Orlando P. and the couple had two children: Amelia (born July 31, 2005) and Yavonne (born May 3, 2009).

The trial on the petition to terminate the three parents' respective rights was held on October 13 and December 7, 2011. On March 20, 2012, the Juvenile Court Judge entered an order terminating Joseph F.'s and Michelle P.'s parental rights to Justin, and terminating Orlando P.'s and Michelle P.'s parental rights to Amelia and Yavonne, vesting complete guardianship of Justin, Amelia, and Yavonne in DCS.

Michelle and Orlando P. appealed; Joseph F. did not appeal. The relevant history leading up to the termination of the parental rights of Michelle and Orlando P. is stated below.

On July 31, 2009, DCS responded to a referral alleging physical abuse of the three children by Orlando P., at which time Amelia was observed to have open abrasions with deep purple bruising on her back. On August 4, 2009, DCS filed a petition in the Davidson County Juvenile Court for emergency removal of Justin, Amelia, and Yavonne from the custody of Michelle P. ("Mother") and Orlando P. ("Father")[1] based upon the children having been abused by Father and Mother's failure to protect them. The petition alleged that Orlando had beaten Amelia with his fists when the child took her hair down after it had been arranged by Mother. The children were removed from the parents' home that day but prior to removing the children from mother's custody, the DCS caseworker asked Mother if she would leave Father and move into a domestic violence shelter with her three children. Mother refused because she felt that moving into a shelter would not improve their situation.

Orlando admitted hitting Amelia, and Mother admitted witnessing the assault but she stated she failed to intervene because she feared Father. Amelia had open abrasions and deep purple bruises on her back as a result of Father's assault. Amelia affirmed Father's abuse during an interview; she also stated that Father had hit Justin and Yavonne as well. Justin and Yavonne were in the home when Father abused Amelia. Justin also affirmed that Father had beaten Amelia and that Father had also hit him and Mother on occasion.

Father and Mother were arrested on May 15, 2010 on charges related to the abuse of Amelia. Father subsequently pled guilty to one count of Child Abuse and one count of Child Neglect, both class A misdemeanors, and was placed on probation for eleven months and

---

[1]We refer to Orlando P. as Father for simplicity although he is not the biological father of Justin C.

twenty-nine days. Mother pled guilty to Child Neglect and was placed on probation for nine months.[2]

On August 4, 2009, the Juvenile Court entered an emergency protective order placing the children in DCS custody; the court also set the case for a preliminary hearing, appointed a guardian ad litem for the children, and appointed counsel for both parents. On August 6, 2009, both parents waived the preliminary hearing agreeing that probable cause existed to remove Justin, Amelia, and Yavonne from their care.

DCS developed initial permanency plans for Mother and Father as it pertained to Justin, Amelia, and Yavonne on August 17, 2009. The plans each had a goal of reunification and required Mother and Father to participate in supervised visitation and communicate with DCS to schedule the visits, arrive on time, bring healthy snacks, and plan appropriate activities; undergo a parenting assessment and follow all recommendations; continue individual and couples counseling; and provide documentation demonstrating compliance with the counseling requirements. The plans also required Father to continue anger management counseling. The plans and copies of the criteria and procedures for termination of parental rights were signed by Mother and Father on August 17, 2009. The initial plans were ratified by the Juvenile Court on September 14, 2009.

On October 15, 2010, the parties appeared before the Juvenile Court at which time Mother and Father entered into an Agreed Order of Adjudication and Disposition as it pertained to the Petition for Dependency and Neglect, agreeing that Justin, Amelia, and Yavonne were dependent and neglected based upon Father's physical abuse of the children and Mother's failure to protect them. The Juvenile Court entered an order finding the children dependent and neglected on February 10, 2011.

DCS developed revised permanency plans for the children on July 19, 2010. The revised plans was similar but more extensive than the initial plan. The revised plan required Mother and Father to (1) participate in supervised visitation and communicate with DCS to schedule the visits, arrive on time, bring healthy snacks, and plan appropriate activities; (2) protect the children from mental and physical harm; (3) complete all assessments and follow all recommendations of assessors; (4) maintain financial assistance including employment, AFDC, food stamps, etc.; (5) maintain stable housing and nutritious meals; (6) complete individual and couples counseling; and (7) provide documentation of all services from providers. In addition, the revised permanency plans also required Father to complete anger management counseling. Mother and Father each signed copies of the revised plans on July 19, 2010, and the revised plans were ratified by the Juvenile Court on July 26, 2010.

---

[2]The guilty pleas were entered into on August 25, 2010.

DCS filed this action to terminate the parental rights of Mother to all three children and the parental rights of Father to Amelia and Yavonne on May 13, 2011. The petition also requested that the court terminate the parental rights of Justin's biological father, Joseph F.

The case went to trial on October 13, 2011. Vickie Green, a DCS Family Services Worker, testified regarding the Department's efforts to assist both parents and the few successes and many failures that followed. Her testimony is generally summarized as follows.

Ms. Green arranged the parenting assessments, domestic violence counseling, and parenting mentor services, all of which was paid for by DCS. She advised Mother about domestic violence shelters and encouraged her to go to one. She also regularly provided bus passes to the parents for transportation to and from work and she provided parenting classes to both parents through Progressive Families, which was under contract with DCS.

Ms. Green explained that Father completed anger management counseling on February 27, 2010, that he had undergone a parenting assessment with a mental health component, and received additional counseling. Mother underwent a parenting assessment with a mental health component and Mother also received individual counseling. She testified that both parents participated in couples counseling. Mother and Father were required to visit the children separately because of an order of protection issued against Father at Mother's request.[3] Both parents visited the children regularly and she characterized the visits as positive. She also explained that visitations were supervised at first. Later on DCS permitted unsupervised visits; however, the visits were terminated when DCS learned that Justin and Amelia were not being fed during the visits.

Mother told Ms. Green that she and Father had a history of domestic violence and that he had abused her for seven years. Ms. Green stated that she had previously given Mother the option of taking the children and moving into a domestic violence shelter; however, Mother refused to enter a shelter, stayed in the home with Father, and Mother consented to the children going into DCS custody. Mother and Father each called her on several occasions to report incidents of domestic violence. In the summer of 2010, Mother called her claiming that Father was hitting her. On August 1, 2010, both Mother and Father called Ms. Green to report an incident where Father accused Mother of infidelity and grabbed Mother's wrist while trying to retrieve her cellular phone to view a text message. In December of 2010, Mother allegedly beat Father and threatened to kill herself.

---

[3]The order of protection was issued against Father on April 19, 2011.

As for her efforts to assist both parents with separate housing, Ms. Green testified that Mother and Father had stable housing when they resided together before the children came into DCS custody, but when the couple separated in 2010, they lost their housing. As a result, she applied for separate housing for Mother and Father through MDHA. She also provided Father a list of places where he could seek employment and a list of places where he could seek residence. At the time of trial, neither parent had stable housing suitable for the children. Mother was living with a friend; Father was living in a motel room where he worked, the Deluxe Inn. Ms. Green stated that she had previously explained to Father that stable housing was an important requirement of the permanency plan and that he would need to seek alternate housing, somewhere other than a motel, to complete the housing requirement, but he refused to seek alternate housing because he said he lived at the hotel for free while he worked there. Ms. Green also testified that Mother had failed to complete the housing documentation and documentation of domestic violence counseling requirements of the permanency plan and that Father had failed to complete the housing requirement and documentation of employment requirements. Ms. Green explained that the lack of suitable housing and continuing incidents of domestic violence were the main barriers to reunification. Ms. Green also stated that even if DCS believed it appropriate to reunify Mother with the children, which it did not, she did not have a stable residence to share with them.

Latara Ballard of Progressive Families testified that she provided therapeutic visitation services and parenting classes for the parents. Ms. Ballard observed the parents' interaction with the children on several occasions and gave a positive description of those brief interactions. The parents told Ms. Ballard about a domestic violence incident that occurred between the two of them. Mother told Ms. Ballard that Father had pushed or hit her and he had been arrested. Father told Ms. Ballard that he had hit Mother because of her infidelity. Ms. Ballard stated that domestic violence was the biggest concern she had about the parents and that she provided recommendations of domestic violence counselors to the parents. Ms. Ballard also counseled the parents on housing. She stated that the parents had a home when she first started working with them but later lost it and that neither parent had found suitable housing thereafter. As for the housing requirement for both parents, Ms. Ballard stated: "It seemed like we had went backwards."

DCS referred Mother and Father to Cheryl McAdams, a therapist at Continuity of Care, for individual and domestic violence counseling. Ms. McAdams stated that the couple attended regularly and she provided counseling services to them on a weekly and biweekly basis from 2009 through part of 2010. Both parents admitted their history of domestic violence to Ms. McAdams. Soon after Ms. McAdams completed her counseling of the parents, Father told Ms. McAdams that he had been arrested for domestic violence. When

asked whether additional counseling would benefit the parents, Ms. McAdams said "I think the parents have the tools they need; it's whether they choose to use them or not."

Mother testified that she was "staying" with a friend named Michael L. at the time of trial and had been staying with him in his one-bedroom apartment for approximately four months. Mother was not on the lease but paid Michael $40.00 per month in rent. Mother had stayed with David O., another friend, during the four months before she moved in with Michael L. Prior to living with David O., Mother had temporarily resided with Father at the King Hotel on Dickerson Road in Nashville. The last time the parents had a permanent home was when the couple lived on Jefferson Street in March 2010, which was their residence when the children were removed by DCS in August of 2009. Mother stated that she knew DCS had not returned the children to her custody because of her continuing difficulties with domestic violence and housing. She admitted seeing Father hitting the children. She further admitted that she and Father had gotten into multiple fights in front of the children, which frightened the children. Despite the altercations, Mother stated that she had been too scared to leave Father.

Father testified to additional information about the couple's history of domestic violence. In 2005, Father was arrested when he bit Mother on the face after she grabbed him around the neck. Father admitted striking Mother in April 2011, after he had completed domestic violence counseling with Ms. McAdams. Father also admitted hitting Amelia but essentially claimed that the severity of the beating stemmed from his exhaustion and frustration over Mother's infidelity. Prior to trial, Father had been referred to a sixteen-week "Batterers Intervention" course by the criminal court.

At the time of the trial, the children were living in a pre-adoptive home, they were doing well, and their foster mother was willing to adopt all three children.

At the conclusion of the trial on December 7, 2011, the Juvenile Court Judge took the case under advisement. On March 20, 2012, the Court entered its final order terminating both parents' parental rights on the grounds of persistence of conditions, Tennessee Code Annotated § 36-1-113(g)(3), and substantial noncompliance with the permanency plan, Tennessee Code Annotated § 36-1-113(g)(2). The persistent conditions cited by the court were the parents' ongoing issues with domestic violence and lack of suitable housing. Acknowledging that the parents had completed some requirements of the permanency plan, the court found it was the parents' failure to apply what they learned while working the plan, particularly the failure to address their domestic violence issues, that constituted substantial noncompliance. The court also found that termination of the parental rights of Mother and Father was in the best interests of the children, again referencing the repeated incidents of domestic violence.

The parents present substantially the same issues on appeal. Whether grounds exist to terminate their parental rights, whether DCS exerted reasonable efforts, and whether termination of their parental rights is in the children's best interests.

## STANDARD OF REVIEW

Parents have a fundamental right to the care, custody and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

Parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions that led to the removal of the child. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones*, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re F.R.R.*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008) (no Tenn. R. App. P. 11 application filed) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

ANALYSIS

I.

SUBSTANTIAL NON-COMPLIANCE WITH PERMANENCY PLAN

The first ground found by the Juvenile Court is failure to substantially comply with the obligations of the permanency plan as set forth in Tennessee Code Annotated § 36-1-113(g)(2). In order to terminate upon this ground, the trial court must determine that the requirements were reasonable and related to remedying the conditions which necessitated the child's placement in foster care. *In re Valentine*, 79 S.W.3d at 547. The trial court must also determine that the parent's noncompliance with the requirements of the permanency plan was substantial. *In re M.J.B.*, 140 S.W. 3d 643, 656 (Tenn. Ct. App. 2004).

A key component of our analysis of this issue requires that we also determine whether DCS provided services reasonably necessary to assist Mother and Father in fulfilling their respective obligations under the permanency plans. *In re C.M.M.*, No. M2003–01122–COA–R3–PT, 2004 WL 438326, at *7-8 (Tenn. Ct. App. Mar. 9, 2004). In that regard, DCS's employees had an affirmative duty to utilize their education and training to assist the parent in a reasonable way to address the conditions that led to the children's removal and to complete the tasks stated in the plan.[4] *In re Giorgianna H.*, 205 S.W.3d. at 518-19; *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. Jun. 30, 2005). Although DCS bears the responsibility to make reasonable efforts toward reunification, the road to reunification is a "two-way street." *State Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006)). A parent desiring to be reunited with his or her children has a corresponding duty to "make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove" their children from custody. *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *16 (Tenn. Ct. App. Dec. 13, 2007) (quoting *In re Giorgianna H.*, 205 S.W.3d at 519). Accordingly, although DCS bears a

---

[4]Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d 148, 158-59 (Tenn. Ct. App. 2007) (citing *In re Giorgianna H.*, 205 S.W.3d at 519) (footnote omitted).

responsibility to facilitate reunification, it does not bear the entire responsibility. *Id*. (citing *State Dep't. of Children's Servs v. S.M.D.*, 200 S.W.3d at 198).

As our discussion of the facts and procedural history reveal, the children were removed due to domestic violence in the home. As a consequence, DCS provided services and counseling to both parents to remedy this condition; yet, Father and Mother continued their long-standing pattern of domestic violence despite having participated in counseling and anger management classes provided and paid for by DCS.

Father failed to change his behavior after attending classes and he either refused to or could not benefit from the services provided. Both parents called Ms. Green reporting the other had initiated an assault. In the summer of 2010, Mother called to report that Father was hitting her; later that summer, Father grabbed Mother's wrists while trying to retrieve her cell phone to view a text from a man.

For her part, Mother continued to provoke Father (allegedly based upon her infidelity). Moreover, after Mother and Father had separated and after receiving the appropriate counseling, Mother physically attacked a male companion with whom she lived with a fork; this occurred after taking anger management classes. Additionally, in December of 2010, Mother allegedly beat Father and threatened to kill herself.

DCS also made several efforts to assist both parents to obtain separate housing due to the fact they could not live together without more domestic violence, and yet neither parent had suitable housing when the case went to trial.

Although DCS's efforts were not herculean, and need not be, they were reasonable to assist Mother and Father in fulfilling their respective obligations under the permanency plans. Despite the reasonable efforts of DCS, neither Mother or Father benefitted from the anger management classes and neither parent obtained suitable housing, both of which were reasonable and very important goals of the permanency plan. Accordingly, we have concluded that the record contains substantial and material evidence which clearly and convincingly proves the ground of substantial non-compliance by each parent with the permanency plan.

## II.
### PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

> (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;
>
> (B)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and
>
> (C)  The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

*Id.*

Justin, Amelia, and Yavonne were removed from the home of Mother and Father and placed in DCS custody on August 4, 2009. The childrens' removal from the parents' custody was based upon a referral that the children had been abused by Father.

On October 15, 2010, the parents appeared before the Juvenile Court, at which time Mother and Father agreed that Justin, Amelia, and Yavonne were dependent and neglected based upon Father's physical abuse of the children and Mother's failure to protect them. The Juvenile Court entered an order finding the children dependent and neglected on February 10, 2011.

DCS filed the petition to terminate Mother and Father's parental rights on May 13, 2011, more than six months after the children were removed from the parents' home and declared dependent and neglected. Thus, DCS complied with the time requirement for the persistent conditions ground of termination. *See id.*; *see also In re Audrey S.*, 182 S.W.3d at 874 (holding that the court order removing the child from the parent's home must be based on a judicial finding of dependency, neglect, or abuse). Because this threshold requirement was met, we must now determine whether there is clear and convincing evidence supporting the requirements in Tennessee Code Annotated § 36-1-113(g)(3)(A) through (C).

The record clearly and convincingly supports the finding that both parents have failed to remedy the most serious condition existing at the time of removal and which necessitated their emergency removal, domestic violence. Thus, the conditions that led to the children's removal, and which in all reasonable probability would cause the children to be subjected to

further abuse, has prevented the children's safe return to the care of Mother or Father and still persists. Tenn. Code Ann. § 36-1-113(g)(3)(A). Further, there is little likelihood that the parents' long-standing and continuous history of domestic abuse will be remedied at an early date so that the children may be safely returned to either parent in the near future. Tenn. Code Ann. § 36-1-113(g)(3)(B). Thus, the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home. Tenn. Code Ann. § 36-1-113(g)(3)(C).

For these reasons, we affirm the trial court's finding that DCS proved by clear and convincing evidence the "persistent conditions" ground under Tennessee Code Annotated § 36-1-113(g)(3) as to each parent.

III.
BEST INTERESTS OF THE CHILDREN

We have affirmed the trial court's findings on two grounds for termination of Mother and Father's respective parental rights. If at least one statutory ground for termination is proven by clear and convincing evidence, a parent's rights may be terminated if it is also determined that termination of the parent's rights is in the best interests of the child. *See In re D.L.B.*, 118 S.W.3d at 367. Therefore, we shall determine whether termination of Mother's parental rights is in the best interests of the children.

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent-child relationship is in the child's best interest. *See id.* The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

In this case, the evidence clearly and convincingly established that each parent failed to make adjustments in circumstance to make their home safe for the children, *see* Tenn. Code Ann. § 36-1-113(i)(1) & (7), in that they continued a pattern of domestic violence which violated the permanency plan and neither of them has a home suitable for the children, despite repeated efforts of DCS to help them find proper housing.

The children have spent almost three years in a loving home with a foster parent who wishes to adopt them. To allow the children to return to either Mother or Father, which could not even be considered until Mother and Father renounce their long-standing pattern of domestic violence and become responsible parents who can provide a safe home, which both have repeatedly been unable to do, would subject the children to more uncertainty and instability, and possibly remove them from a safe, happy, healthy, and loving home. Tenn. Code Ann. § 36-1-113(i)(5).

Considering these relevant factors from the children's perspective, we find clear and convincing evidence that it is in the children's best interest that Mother and Father's respective parental rights be terminated.

## IN CONCLUSION

The judgment of the trial court is affirmed in all respects and this matter is remanded with costs of appeal assessed against the Department of Children's Services due to the parents' indigency.

_____
FRANK G. CLEMENT, JR., JUDGE