IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2013

**IN RE DAVID L. R. ET AL.**

**Appeal from the Chancery Court for Lawrence County**
**No. 1542911      Jim T. Hamilton, Judge**

**No. M2013-01249-COA-R3-PT - Filed December 6, 2013**

The parents of six children appeal the termination of their parental rights. The trial court terminated the parental rights of both parents on two grounds, substantial noncompliance with the permanency plans and persistence of conditions, and the determination that termination of both parents rights was in the best interests of the children. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Ronald G. Freemon, Columbia, Tennessee, for the appellant, Joshuia R.[1]

Stacie Odeneal, Lawrenceburg, Tennessee, for the appellant, Melisha R.

Robert E. Cooper, Jr., Attorney General and Reporter, Leslie Curry, Assistant Attorney General, Mary Byrd Ferrara, and S. Craig Moore, Nashville, Tennessee, for the appellant, Tennessee Department of Children's Services.

Michael Wallace Coleman, Jr., Lawrenceburg, Tennessee, for minor children, David L.R., Delayna J.R., Ashton B.R., Sara M.R., Ethan A.R., and Heather G.R.

**OPINION**

Joshuia R. ("Father") and Melisha R. ("Mother"), married in February 2003, are the parents of six children: David (born September 1997), Delayna (born November 1998),

___

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

Ashton (born August 2001), Sara (born February 2003), Ethan (born September 2004) and Heather (born November 2005). Except for Heather, all of the children were placed in the custody of the Department of Children's Services ("the Department") in 2005. Mother regained custody of the children in August 2006. In October 2006 Mother was hospitalized for approximately two weeks due to a bipolar disorder. When she went into the hospital, she did not leave the children in the care and custody of Father, instead Mother gave powers of attorney to three members of the Glass family and the children resided with members of that family in three separate households.

Upon the petition of the Department, the Juvenile Court of Maury County issued an emergency protective custody order placing the children in temporary State custody on March 5, 2007. The case was transferred to Lawrence County, where the parents resided, and the Lawrence County Juvenile Court adjudicated the children dependent and neglected on September 6, 2007.[2] The children have been in foster care continuously since the juvenile court's protective custody order.

All but one of the children have special needs. Delayna is receiving residential mental health treatment at Parkridge Valley Hospital, a youth psychiatric hospital, in Chattanooga, for schizoaffective disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder ("ADHD"), and other mental health conditions. David has Asperger's Syndrome and obsessive compulsive disorder. Ethan and Ashton have been diagnosed with ADHD. Sara and the other children, except for Heather, have been receiving mental health therapy ever since they came into state custody.

After the children were placed in state custody and Mother was released from the hospital, she continued to live with Father until they separated in May of 2010. Since that time, Mother has resided with her boyfriend James P. in Mt. Pleasant, Tennessee although Mr. P. is married. Father, who is still married to Mother, is now dating Mother's twin sister.

In March 2009, following statements by one of his daughters that Father sexually abused her and one of her sisters, the juvenile court entered an order that Father not have contact with the children. Father did not file a motion with the juvenile court to contest or lift the no-contact order for two years, until mid-2011, and that motion was withdrawn without a hearing. Father has not filed any other motion to have visitation or any form of contact with the children reinstated. Thus, Father has not had any visitation, telephone calls, correspondence or other contact with any of the children since March 2009.

---

[2]All subsequent proceedings have been in Lawrence County.

The juvenile court also suspended Mother's visitation with the children in March 2009, and two years passed without her having any visitation with the children. It was not until the spring of 2011, that Mother filed a motion to have visitation reinstated; the juvenile court granted her motion and reinstated visitation, affording her monthly supervised visitation. A few months later, in late 2011 and early 2012, Mother began acting inappropriately during the monthly visitations with her children. She would tell the children not to clean up the mess they made, she "flipped off" a Department worker with her middle finger in front of the children, on two occasions she called a foster mother "bitch" and a Department worker a "bitch" in front of the children, screamed in anger, told Ethan he did not have to listen to others, threw objects during visitation, and told two of the children that if she ever ran into her married boyfriend's wife that she would "beat her down to the ground."

In February 2012, the Foster Care Review Board recommended that Mother's visitation cease due to her inappropriate behaviors during visitation. The juvenile court adopted the Board's recommendation and, on March 5, 2012, ordered a cessation to Mother's visitation with the children. Mother did not file a motion seeking to restore visitation; therefore, visitation was never restored.

The petition to terminate the parents' parental rights was tried over four days in March, April, and November of 2012. Mother and her attorney and Father and his attorney participated at trial as did a guardian ad litem for the children.

At the conclusion of the trial, the trial court made numerous and specific findings of fact including the following:

> 11. The Department made reasonable efforts to help [the parents] satisfy the requirements in the permanency plan by providing community resource guides to [the parents]; providing [Mother] with community contacts to help her pay her utility bills; helped in showing [Mother] how to prepare a monthly budget to help manage her finances; providing parenting assessments; providing supervised and therapeutic visitation for [the parents] prior to Court Orders prohibiting visitation between [the parents] and the children; providing parenting services; researching the requirements [Father] would need to complete to reinstate his driver's license, and providing that information to him; provided [the parents] information about the children's schools and how they could participate in the children's schooling, including addresses of and directions to the schools and schedules of parent/teacher conferences; providing transportation for [Mother] to and from visitation with the children, including long-distance transportation to visit with Delayna [R.] who is in a

residential treatment facility in Chattanooga; providing information to [Mother] to assist in finding and applying for low-income or affordable housing; provided information to [the parents] regarding child safety and community resources to obtain child safety seats; provided information to [the parents] regarding community resources for transportation; contacting housing authorities to assist [Mother] in obtaining housing; and obtaining therapy for the children.

12. The Department removed the children from their home because of the parents' inability to provide proper care for the children and the mother's failure to properly address her mental health problems. The conditions that led to the removal still persist. Moreover, other conditions exist in the home that, in all reasonable probability, would subject the children to further abuse and neglect and which, therefore, prevent the children's return to the care of [the parents].

Neither [parent] has provided an appropriate, stable home with adequate space for the children. Despite ongoing DCS involvement for over four (4) years, [the parents] have failed to obtain and maintain suitable housing and employment or other source of income to provide for the children.

[Father] continues to have no contact with the children pursuant to Court Order. Subsequent to the children's entry into foster care in 2007, [Father], was indicated as the perpetrator of sexual abuse against the children.

In 2011, [the parents] got into a fight, and [Father] purposefully destroyed some of [Mother's] property in his anger. Regarding his history of violence and mental health instability, [Mother] testified he previously had pushed her out of the car once when he was driving and once had grabbed her by the throat and threw her against the wall.

[Mother] continues to have no visitation with the children pursuant to Court Order. Her inappropriate behaviors during her 2011 and 2012 visitation with the children resulted in the Foster Care Review Board recommending that her visitation be stopped and in the Juvenile Court ordering a cessation of her visitation.

[Mother] still does not take any psychotropic or mental health medication and does not participate in mental health treatment or therapy despite her ongoing bipolar disorder, depression and erratic behaviors.

13. There is little likelihood the above-mentioned conditions will be remedied at an early date so that these children can be returned to [the parents] in the near future because for a period of about six years, the Department has made reasonable efforts to help [the parents] remedy the conditions, to no avail. The Department provided community resource guides to [the parents], provided parenting assessments, provided supervised and therapeutic visitation for [the parents] prior to Court Order prohibiting visitation between [the parents] and the children, provided parenting services, and provided other reasonable efforts already mentioned above.

14. Continuation of the parent/child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home.

15. [The parents] have not made such an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interests to be in their home(s).

16. [The parents] have failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible.

17. There is no meaningful relationship between [the parents] and the children. [Father] has had no contact with the children since the spring of 2009. Since the spring of 2009, [Mother] only had about four hours of visitation per month with the children for about one year, from the spring of 2011 to the spring of 2012, and has had no visitation with them at all since the Juvenile Court ordered a cessation of visitation on March 5, 2012.

18. A change of caretakers and physical environment resulting in a return of the children to [the parents] is likely to have a detrimental/negative effect on the children's emotional, psychological and medical conditions.

19. [The parents] abused or neglected the children.

20. [Father] showed sexual abuse or neglect towards one or more of the children.

21. [The parents'] mental and/or emotional statuses would be detrimental to the children and/or prevent [the parents] from providing safe and stable care and supervision for the children and from effectively parenting the children.

22. [Father] has shown little or no interest in the welfare of the children.

23. Ethan, Ashton, Heather, and Sarah [R.] have been placed in a foster home by the Department. Their foster parents love them, care for them, and the children have bonded with their foster parents. Their foster parents wish to adopt them. David [R.] has been placed in another foster home by the Department. His foster parents love and care for him and he has bonded with his foster parents, who wish to adopt him.

The trial court then set forth its conclusions of law stating that both parents failed to comply in a substantial manner with their responsibilities set out in the permanency plans that related to remedying the conditions which necessitated foster care placement; that the children were removed from the parents care and custody for a period of at least six months and they have not remedied the conditions that led to the children's removal; that conditions persist that in all reasonable probability would cause the children to be subjected to further abuse or neglect, which prevent the children's safe return to the parents' care; that there is little likelihood that these conditions will be remedied at any early date so that the children can be returned to the parents in the near future; and that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home. The trial court also concluded that it was in the children's best interests that both parents's parental rights be terminated.

Based upon the foregoing findings of fact and conclusions of law the trial court entered judgment on May 13, 2013, terminating the parental rights of Father and Mother to all six children.

Both parents filed timely notices of appeal. Father presents three issues: whether the evidence is sufficient to establish that he did not substantially comply with the permanency plans; whether the evidence is sufficient to establish that the Department made reasonable efforts to help him satisfy the requirements of the permanency plan; and whether the evidence is sufficient to establish that he did not remedy the conditions that led to removal of the children. Mother presents eleven issues, most of which can be summarized as being the same three Father raises plus one additional issue; whether termination of her parental rights is in the best interests of the children.[3]

---

[3]Mother also questioned whether she was deprived of her statutory and constitutional rights because she was not appointed counsel at all states of the juvenile court proceedings; however, she failed to cite to the record any instance where she was not represented by counsel. Thus, this issue is waived. *See* Tenn. R. App. P. 27(g).

STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). When a trial court has made findings of fact, we review the findings de novo on the record with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639 (citing *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013)). We next review the trial court's order de novo to determine whether the facts amount to clear and convincing evidence that one of the statutory grounds for termination exists and if so whether the termination of parental rights is in the best interests of the children. *Id*. at 640. Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id*. (citing *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)) (internal quotation marks omitted).

## ANALYSIS

### I. PERMANENCY PLAN AND THE DEPARTMENT'S EFFORTS

This is not a case where reasonable efforts are excused;[4] therefore, before examining the grounds at issue, we must first determine whether the terms and goals of the permanency plans were reasonable and related to remedying the conditions which necessitated removal of the children and whether the Department exerted reasonable efforts to assist Mother and Father to achieve the goals and to be reunited with their children.

"Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their

---

[4]The Department is not required to make reasonable efforts every time it removes a child. In certain aggravated circumstances, such as severe child abuse, the Department is relieved of this duty. Tenn. Code Ann. § 37-1-166(g)(4); Tenn. Code Ann. § 36-1-113(g)(7).

parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). The Department's first obligation in this regard is to establish permanency plans, the terms of which are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This statutory policy does not require that the Department's effort to reunify the family be "herculean"; nevertheless, the Department's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *S.M.D.*, 200 S.W.3d at 198.

A. PERMANENCY PLANS

The children were removed due to their parents' inability to care for and protect the children and Mother's mental health problems. Soon after their removal, the Department learned that the children had substantial medical and mental health needs which were not being attended to appropriately by either parent. The Department also learned that neither parent had a source of income necessary to provide safe and stable housing for the children. Because of the above concerns, the Department developed permanency plans with goals to

improve both parents' parenting skills, help them obtain a source of income by employment or benefits, to obtain suitable and stable housing, and to protect the children.

Initial permanency plans required, among other things, that both parents provide adequate housing and a loving, stable home for the six children; that Father participate in a mental health intake and follow recommendations; that Mother participate in an updated psychological evaluation; that both participate in parenting classes; and that Mother participate in mental health counseling and medication management and take her medications as prescribed. As time passed, the permanency plans were revised on several occasions; however, the core requirements remained generally the same.

The permanency plans as they were revised on December 8, 2009, restated the requirements in the initial plans and added the following: that both parents provide proof of adequate housing by December 18, 2009, and appropriate furnishings including beds for the children and that Father follow the recommendations of his counseling and medication management. On May 28, 2010, the plans were revised to add the following requirements: that Father obtain separate housing due to the sexual abuse allegations made against him by the children; that Mother participate in non-offender sexual abuse counseling to develop a plan for close supervision of the children; that Father address the sexual abuse allegations in counseling; and both parents contact the child support office for calculation and assessment on child support. The Department explained the new requirements and responsibilities to both parents on May 28, 2010, and both parents signed the revised plans on that date.

Another revision was made on March 22, 2011; the new plan restated the above requirements and additionally required Mother obtain safe, stable housing with appropriate furnishings and that both parents participate in education and IEP meetings and parent-teacher conferences regarding the children. A September 28, 2011, permanency plan restated these requirements and included that Mother maintain regular and positive visitation with the children; that Father would pay child support; that Mother would participate in mental health therapy until released by provider; that Mother continue treatment for her seizures until released by medical provider; and that Father participate in mental health treatment until released by provider and sign a release allowing the Department to obtain those records and verify participation. Subsequent permanency plans developed January 25, 2012, and September 17, 2012, restated these requirements.[5]

Considering the parents' deficiencies and the children's needs, we have concluded that the requirements and goals identified in the permanency plans for each parent were

---

[5]Each plan was ultimately presented to and approved by the juvenile court in a timely fashion.

reasonable and related to remedying the conditions which necessitated the removal of the children from their care and the resulting foster care placement. Therefore, we have concluded that the permanency plans satisfied the requisite criteria. *See In re Valentine*, 79 S.W.3d at 547; *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C).

## B. REASONABLE EFFORTS

Due to Mother's underlying mental health issues that affected her ability to properly care for and protect the children, the Department attempted to assist Mother with her mental health requirements by arranging mental health counseling and therapy; however, Mother was anything but cooperative. Although the Department made arrangements for the Mental Health Cooperative to assist Mother, Mother repeatedly refused to provide a medical release for the Department to follow through with Mother's mental health needs and requisite services. Moreover, a case manager from Mental Health Cooperative regularly went to her home to check on Mother and her living conditions and she repeatedly encouraged Mother to see a mental health therapist and obtain psychotropic medications, but Mother never did. The Department also made arrangements for Mother to receive assistance at Centerstone, a community-based behavioral healthcare facility that offers a full range of mental health services, substance abuse treatment and educational services, but Mother seldom attended her scheduled appointments or sessions.

The Department also made arrangements for Father to have mental health care, but he too refused to provide the appropriate release and he refused treatment; thus, the Department was unable to make further efforts regarding either parent's mental health needs.

As for other basic services, Meredith Worsham, a Department case worker testified about the services and assistance she provided the parents from November 10, 2009 to June 2011. To assist mother in learning how to parent the children, arrangements were made for therapeutic visitation counseling at Omni Visions, which provides individuals and families with a community support system to facilitate and inspire growth and development. Also, Ms. Worsham stated that she assisted them to find financial aid to pay electric bills by referring Mother to community resources and providing a list to include Family-to-Family services, employment and housing.

Considering the above facts and other relevant evidence we have not yet addressed, but shall do so in the following discussion, we have determined the Department exerted reasonable efforts to assist Mother and Father to achieve the stated goals.

We now turn our attention to the statutory grounds at issue: substantial noncompliance with the permanency plans and persistence of conditions to determine whether the evidence clearly and convincingly establishes at least one of these grounds.

## II. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

### A. SUBSTANTIAL NONCOMPLIANCE WITH THE PERMANENCY PLANS

A parent's failure to comply with a parenting plan is a ground for termination of their parental rights. Tenn. Code Ann. § 36-1-113(g)(2). In order for noncompliance to justify the termination of parental rights, it must be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 546.

The first permanency plan was adopted on April 7, 2010. Pursuant to the first and subsequent plans, the goals of which remained consistent, the parents were to obtain suitable and stable housing, a source of income, work with Omni Visions and the children's placement contacts to learn ways to handle the children's behaviors, continue attending mental health counseling, and develop the skills necessary to respond to the children's special needs. Neither parent accomplished any of these goals.

Neither of them maintained adequate or stable housing for the children; to the contrary, in early 2010, they lived in a trailer on William and Earl Road until the utilities and water eventually were cut off and they had to move. They then moved in with Father's father. Then, in March 2010, they moved to a one-bedroom apartment in Lawrenceburg. Mother stayed at the apartment for about three months and then separated from Father. Thereafter, she began staying with friends in Mt. Pleasant and later moved in with her boyfriend, James P., where she continues to reside, in a one bedroom apartment; which like all of the previous temporary lodging, is wholly inadequate for one or two adults with six children.

Father was prohibited from visiting with the children since 2009 and Mother did not maintain regular or positive visitation with the children even after the order barring her visitation was lifted in 2009. In 2011 and 2012, Mother engaged in very inappropriate behavior during visitation, resulting in the Foster Care Review Board recommending her visitation cease and the juvenile court ordering a cessation of her visitation in March 2012.

Neither parent complied with the mental health requirements in the permanency plans. Mother has bipolar disorder, depression, was diagnosed with borderline personality disorder, and has a history of cutting herself. She testified she stays depressed, frequently is irritable

or angry, and has heard voices. She, however, does not take psychotropic or mental health medications to help control her mental health problems and has gone only sporadically and a few times to see a mental health therapist or professional for treatment. Although a case manager from Mental Health Cooperative regularly has come to her home to check on her and her living conditions, the case manager is not a mental health therapist who can provide any treatment or medication. To the contrary, the Mental Health Cooperative records indicate the case manager has tried to encourage Mother to see a mental health therapist and obtain psychotropic medications, but Mother has not done so.

Father's participation in mental health counseling was sporadic, sometimes missing meetings and sometimes not taking his mental health medications. Neither parent provided a release to the mental health providers to allow the Department to obtain their records and verify their participation and compliance.

Neither parent works nor did they make any improvement in their ability to earn a sustainable income. Both parents receive SSI income for mental health disabilities; Mother receives $698 per month in SSI benefits and $70 per month in food stamps, and Father receives $698 per month in SSI benefits and $138 per month in food stamps. Neither parent provided a monthly budget or plan as to how they would be able to manage their expenses and financially provide for the children. With respect to Mother's ability to manage her finances, Mother admitted spending between $20 to $80 per month for cigarettes, yet she says she cannot pay child support.

The foregoing, and other evidence in the record, established by clear and convincing evidence that each parent was in substantial noncompliance with the permanency plans. Therefore, we affirm the trial court's finding that both parents failed to substantially comply with the requirements of the permanency plans.

## C. PERSISTENCE OF CONDITIONS

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that,

-12-

therefore, prevent the child's safe return to the care of the parent(s) . . . , still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

*Id.*

The initial permanency plans and all revised plans required, in pertinent part, that both parents provide adequate housing and a loving, stable home for the children, that Father participate in a mental health intake and follow recommendations, that Mother participate in an updated psychological evaluation, that both participate in parenting classes, and that Mother participate in mental health counseling and medication management and take her medications as prescribed. The evidence in this record, which we summarized earlier in this opinion, clearly and convincingly established that neither parent made any material changes to the conditions that existed when the children were removed in 2007; they did not obtain the necessary mental health treatment to be able to care for the children, they did not learn appropriate parenting skills, they did not obtain safe and suitable housing, or a sustainable income or benefits to provide for the children. Moreover, the record clearly and convincingly established that there is little likelihood that these conditions will be remedied at an early date so that the children may be safely returned to either parent in the near future, and that the continuation of the parent and child relationship greatly diminishes the children's chances of early integration into a safe, stable, and permanent home.

For these reasons, we affirm the trial court's finding that the Department proved the "persistent conditions" ground for termination of Mother's parental rights by clear and convincing evidence, pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

## II. BEST INTERESTS OF THE CHILDREN

The Tennessee General Assembly has provided a list of factors for the court to consider when conducting a best interest of the child analysis. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *See In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory

factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent child relationship is in the child's best interest. *See In re M.A.R.*, 183 S.W.3d at 667. The child's best interest is to be determined from the perspective of the child rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

In this case, the evidence clearly and convincingly established that both parents failed to make an adjustment in circumstance to provide a safe and stable home for the children. *See* Tenn. Code Ann. § 36-1-113(i)(1). Further, to allow the children to return to either parent, which could not be considered until one or both make many positive changes and becomes a responsible parent, and which each parent repeatedly failed to do, would subject the children to more uncertainty and instability. Moreover, it would require the removal of the children from environments where their conditions have dramatically improved and they are much happier, healthier, and safer. *Id.* § 36-1-113(i)(5).

Considering these relevant factors from the children's perspective, the evidence clearly and convincingly established that it is in the children's best interests that Mother's and Father's parental rights be terminated.

**IN CONCLUSION**

The judgment of the trial court is affirmed in all respects and this matter is remanded with costs of appeal assessed against both appellants, jointly and severally.

_____
FRANK G. CLEMENT, JR., JUDGE