# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 24, 2014 Session

## IN RE AALIYAH R.

**Appeal from the Juvenile Court for Rutherford County**
**No. TC 1829T      Donna Scott Davenport, Judge**

---

**No. M2013-01882-COA-R3-PT- Filed June 17, 2014**

---

Mother appeals the termination of her parental rights. The trial court found four grounds for termination of Mother's parental rights: substantial noncompliance with the requirements of the permanency plan, failure to support financially, failure to provide a suitable home, and persistence of conditions; the court also determined that termination was in the best interest of the child. Mother appeals arguing the evidence is insufficient to establish any of the grounds and that termination was in the child's best interest. We have determined that the evidence clearly and convincingly supported two of the grounds, that of substantial noncompliance with the requirements of the permanency plan and persistence of conditions. We have also determined that termination was in the child's best interest. Therefore, we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Mark J. Downton, Nashville, Tennessee, for the appellant, Sharon C.[1]

Robert E. Cooper, Jr. Attorney General and Reporter, Jordan Scott, Assistant Attorney General, and Christine S. Carlton, for the appellee, Tennessee Department of Children's Services.

---

[1]This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

# OPINION

Sharon C. ("Mother") and Duane R. ("Father") are the parents of Aaliyah R., born in May of 2004. Aaliyah was residing with Mother at a homeless shelter prior to Mother's arrest for criminal assault upon another resident. Upon Mother's incarceration, Aaliyah was placed in the custody of the Department of Children's Services on May 15, 2011, when Mother could not provide a family placement for the child. Father was unavailable to care for the child because he was incarcerated in New York. Therefore, the child was placed in foster care soon thereafter, where she has remained ever since.

The Department soon recognized that Mother exhibited erratic behavior, anxiety, aggression, and paranoid manifestations. Due to this circumstance and the fact Mother had been living in a homeless shelter, the first permanency plan was entered in June 2011, which identified two explicit concerns that prevented Aaliyah from returning to Mother: the aforementioned mental health issues and Mother's lack of housing. Under the parenting plan, Mother was required to submit to a full psychological examination, participate in individual therapy, medication management, take prescriptions as prescribed, submit to random drug screens and pill counts to ensure that she was taking medication, participate in supervised-visitation services, obtain stable housing and a legal source of income.

On August 17, 2011, the trial court adjudicated Aaliyah to be dependent and neglected, relying on Mother's residential and financial instability and need for mental health counseling. Mother was awarded supervised visitation with the child; however, no child support order was entered.

In December 2011, the Department set up a second permanency plan the requirements of which were substantially the same but additionally required Mother to participate in therapy and demonstrate mental health stability. The plan specifically noted that Mother had refused to participate in mental health therapy and had only participated in four of fourteen available visitations with her child.

In January 2012, Mother began therapy and was prescribed medication. Mother's case worker additionally looked into several housing programs and identified a program that provided secure housing for chronically homeless individuals by providing mental health treatment, medication management, and housing options. The case worker filled out the referral form and submitted it to the program in January 2012; however, Mother refused to participate in the interview and assessment until March. Once involved in the program, Mother applied for and acquired social security disability benefits, which she began receiving in July.

After Mother secured the benefits, she independently rented an apartment, but she soon claimed it was inappropriate for Aaliyah. Mother then rented a second apartment even though she was still obligated on the lease for the first apartment and did not have the funds to pay both. She quickly deemed the second apartment inappropriate, after which she returned to a homeless shelter.

Although Mother began participating in therapy in January 2012, she failed to attend most of her appointments. She missed a February session, a June session, and she failed to attend any of her appointments in July, August, or September. She did not return to therapy until mid-October and she failed to attend any of her November appointments. She returned to therapy in December and also attended in January 2013. Mother's therapist reported that she was very resistant to treatment, that she refused to take prescribed medication, and she refused to participate in the pill counts as required by the permanency plan.[2]

On June 29, 2012, the Department filed a petition to terminate the parental rights of Mother and Father alleging the grounds of mental incompetency, abandonment for failure to support, abandonment for failure to establish a suitable home, substantial noncompliance with the permanency plan, and persistent conditions. The Department also alleged that termination of both parents' rights was in the best interest of the child due to the parents' failure to effect lasting adjustments after reasonable efforts, the parents' failure to maintain regular visitation with the child, the parents' failure to pay child support, and Mother's mental and emotional status.

The trial was held over four days, on December 21, 27, and 28, 2012, and February 12, 2013. Mother only appeared on the last day of trial although her attorney participated throughout the trial. An order was entered on July 26, 2013, pursuant to which the parental rights of Mother and Father were terminated. The court terminated Father's parental rights on the grounds of abandonment by an incarcerated parent and substantial noncompliance with the permanency plan. As to Mother, the court found that the Department provided several services to Mother, but she nevertheless failed to demonstrate an ability to provide for her child's needs. The court denied the mental incompetence ground for termination, but found that the following grounds existed to terminate Mother's parental rights: substantial noncompliance with the requirements of the permanency plan, persistence of conditions, abandonment by failure to provide a suitable home, and abandonment by failure to support. The court also determined that termination of the parental rights was in the best interests of the child. Mother filed a timely notice of appeal; Father did not appeal.

---

[2]A third permanency plan was developed on June 26, 2012, which contained identical requirements as the second, but it has no relevance to this appeal.

Mother presents the following issues for our review: whether the trial court erred in finding the four grounds for termination of her parental rights under Tennessee Code Annotated § 36-1-113, and whether termination of her parental rights is in the best interests of the child.

## STANDARD OF REVIEW

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). When a trial court has made findings of fact, we review the findings de novo on the record with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639 (citing *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013)). We next review the trial court's order de novo to determine whether the facts amount to clear and convincing evidence that one of the statutory grounds for termination exists and if so whether the termination of parental rights is in the best interests of the children. *Id*. Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id*. (citing *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)) (internal quotation marks omitted).

## ANALYSIS

### I. PERMANENCY PLAN AND THE DEPARTMENT'S EFFORTS

"Because of the prominent role that the Department plays in the lives of so many dependent and neglected children, the Tennessee General Assembly has explicitly imposed on the Department the responsibility to make reasonable efforts to reunify children and their parents after removing the children from their parents' home." *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007) (citing Tenn. Code Ann. § 37-1-166). The Department's first obligation in this regard is to establish permanency plans, the terms of which are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This statutory policy does not require that the Department's effort to reunify the family be "herculean"; nevertheless, the Department's employees "must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). In cases like this one, the factors that courts use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts. *In re Tiffany B.*, 228 S.W.3d at 158-59 (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

Although the Department bears a heavy responsibility with regard to reunification, the road to reunification is a "two-way street." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006). Parents desiring to be reunited with their children "must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519. Accordingly, even though the Department bears a heavy responsibility to facilitate reunification, the Department does not bear the entire responsibility. *S.M.D.*, 200 S.W.3d at 198.

A. Permanency Plan

Mother and child were residing in a homeless shelter at the time the child came into protective custody, and the record reveals Mother's lack of an established home and transient history.[3] Further, the Department soon recognized Mother was experiencing anxiety and other mental health issues; as a result, the Department developed a permanency plan focusing on Mother's mental health issues so that she could obtain housing as well as a source of income.

This plan was developed on June 6, 2011, with the goal of reunifying Mother and child and the desired outcome that Mother demonstrate consistent stability and lawful behavior. Under the parenting plan, Mother was required to submit to a full psychological examination by the end of the month; participate in individual therapy, medication management, and follow all recommendations; take prescriptions as prescribed; submit to random drug screens and pill counts to ensure that she was taking medication; participate and maintain therapeutic supervised visitation; participate in parenting classes in the community;

---

[3]Prior to the Department's involvement, Mother and Aaliyah had lived in New York, Pennsylvania, Rhode Island, and Tennessee.

and create plans for a budget and transportation. The plan also required Mother to secure housing and obtain a steady income to provide for the needs of Aaliyah.

A second permanency plan was developed on December 12, 2011, with goals of returning to parent as well as adoption, in light of the fact that Mother failed to make progress on the original permanency plan and had refused to participate in individual therapy, medication management, and refused to take her medication. This plan was substantially similar to the first, with the added requirement that Mother provide proof of her victimization through stalking and interference with her maintaining housing and employment.

We have concluded the above requirements and goals identified in the permanency plans were reasonable and related to remedying the conditions which necessitated the removal of the child from Mother's care and the resulting foster care placement. Accordingly, the plans satisfied the requisite criteria. *See In re Valentine*, 79 S.W.3d at 547; *see also* Tenn. Code Ann. § 37-2-403(a)(2)(C).

### B. Reasonable Efforts

The record reflects a litany of services provided by the Department to help Mother accomplish her goals. A family case worker for the Department, Amanda McKinney, arranged mental health counseling and individual therapy to treat Mother's mental health concerns. The Department referred her to a psychotherapist at Centerstone and followed through to make sure that she set up her initial appointment and that she attended her sessions. The Department also helped Mother become involved with the Safety Net program due to her lack of insurance. Ms. McKinney also arranged parenting classes that fit Mother's schedule, and she coordinated Mother's therapeutic supervised visitations with Aaliyah. When those visitations proved unsuccessful, the Department decided to fund therapeutic supervised visitation with a third-party provider, the Exchange Club, in order to provide a more structured setting.[4]

The Department also funded an unlimited bus pass so that Mother could have transportation. After Mother missed several important appointments, Ms. McKinney provided Mother with planners so that she could remember important dates. In addition, the

---

[4] During the first supervised visitation, the Department set up a meeting in a public place with its therapeutic provider, which escalated into a violent outburst. At the second visitation, the meeting was held in the Department's offices, which again involved violent outbursts from Mother. As a result, the Department began utilizing a third-party provider to establish more structure.

Department conducted child and family team meetings and foster care reviews, funded a clinical interview, a parenting assessment and a psychological evaluation, and attempted to set up home visits, which Mother canceled due to her lack of adequate housing.

Ms. McKinney testified that she looked into several housing programs for Mother and eventually found a program designed to secure housing for chronically homeless individuals. Ms. McKinney filled out the referral form and submitted it to the program in January 2012. After Mother began the program, Ms. McKinney testified that she assisted Mother in obtaining social security disability benefits, which she started to receive in July 2012.

Considering the above facts and other relevant evidence we have not yet addressed, we have determined the Department exerted reasonable efforts to assist Mother to achieve the stated goals. We now turn our attention to the statutory grounds at issue: substantial noncompliance with the permanency plans, persistence of conditions, and abandonment to determine whether the evidence clearly and convincingly establishes one or more of these grounds.

## II. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

### A. Substantial Noncompliance with the Permanency Plan

Noncompliance with the permanency plan is a statutory ground for termination of a parent's rights. Tenn. Code Ann. § 36-1-113(g)(2). For noncompliance to justify the termination of parental rights, it must be "substantial" noncompliance. *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 546.

The first permanency plan was developed on June 6, 2011. Pursuant to the first and subsequent plans, the goals of which remained consistent, Mother was to, *inter alia*, submit to a psychological examination, participate in individual therapy, take medications as prescribed, submit to random drug screens and pill counts, obtain and maintain suitable housing, maintain legal means for financial support, and become more involved with her child by attending supervised visits.

Although Mother completed the psychological examination, she failed to consistently attend therapy, take her medication, and submit to pill counts, all of which were required under the plan. Mother's hostility to mental health treatment continued throughout her involvement and until the conclusion of the termination proceedings. Mother testified on the

-7-

last day of trial, "I don't need the medication," and, "I don't believe in medication. I believe in God." Mother stated that, instead of requesting other types of medication, she used coping skills to reduce her anxiety and, "not let stuff rent space in [her] mind."

Moreover, Mother failed to maintain regular visitation with Aaliyah. In 2011, she attended only four of fourteen scheduled visitations. From January to June 2012, however, Mother became fairly consistent in attending supervised visitation every other weekend for two hours, with transportation provided by her case worker, Ms. McKinney. When Ms. McKinney advised Mother in a June child and family team meeting that Mother should take a more active role and be responsible for transportation to and from these visitations, Mother began to miss visitation appointments, despite their location in Nashville where Mother lived. These inconsistencies continued from June until the time of trial, with Mother missing all visitations in December 2012, when the termination hearings occurred.

Mother also missed several foster care reviews and several child and family team meetings. Because of her absence, Ms. McKinney provided Mother with several planners to remind her of the important dates, but Mother lost the planners. As noted earlier, Mother failed to attend all but the last day of trial. In addition, it was difficult for the Department to maintain contact with Mother, as Ms. McKinney testified that Mother was constantly changing addresses and telephones without notifying the Department of the changes as required by all of the permanency plans.

As for stable housing, Mother failed to maintain adequate housing. After she began receiving her social security disability benefits, Mother rented an apartment in July of 2012, but she soon determined it was not suitable for Aaliyah, so she rented a second apartment, even though she was still obligated to pay rent on the first apartment. Mother soon realized that she was unable to afford two apartments, and by November 2012, she returned to the homeless shelter. The permanency plans required Mother to maintain stable housing that was suitable for Aaliyah, and despite the Department's reasonable efforts and obtaining a legal source of income, Mother failed to do so. Although Mother testified on the last day of trial that she had moved into another apartment the week before, she admitted "it needs a little bit of fixing," and the trial court reasoned that this was "too little, too late," and we agree.

The record clearly and convincingly established Mother was in substantial noncompliance with the permanency plans. Therefore, we affirm the trial court's finding that Mother failed to substantially comply with the requirements of the permanency plan.

## B. Persistence of Conditions

Tennessee Code Annotated § 36-1-113(g)(3) specifies the essential elements for the "persistent conditions" ground for termination of parental rights. It provides that grounds for termination exist when:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> >
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).

Mother and child were residing in a homeless shelter when the child was removed from Mother's care. Soon after, the Department recognized that Mother suffered from mental health issues, and identified treating her mental health and obtaining adequate housing as the two primary concerns preventing the safe return of Aaliyah to Mother's care. As discussed above, while Aaliyah was in protective custody, Mother failed to address her mental health issues or obtain stable housing. She failed to attend therapy, take medication, and continued to discuss her manifestations that people were stalking her and preventing her from complying with the requirements of the permanency plans. In fact, during trial, she admitted that she continued to have severe anxiety in the months preceding trial and that she did not believe in medication to help her. Mother's inability to provide a stable environment for Aaliyah is further exhibited by her previous transient history. Despite the Department's efforts, Mother failed to complete these portions of the permanency plans.

Mother argues that she remedied the conditions which led to her child's removal by obtaining housing and a legal source of income by the time of trial. However, as the trial court noted, "[w]hile we acknowledge certain late efforts by Mother to improve her situation such that she could be a fit parent to the Child, these efforts are insufficient and far past due. The Child, now in a suitable pre-adoptive home, deserves stability and predictability in her life." *In re Krissa E. M. L.*, E2012-01938-COA-R3-PT, 2013 WL 772914 (Tenn. Ct. App. Feb. 28, 2013).

The record clearly established that there is little likelihood that Mother's untreated mental health issues and continuous housing deficiencies will be remedied so that the child may be safely returned to Mother in the near future, and that the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home. For these reasons, we affirm the trial court's finding that the Department proved the "persistent conditions" ground for termination of Mother's parental rights by clear and convincing evidence pursuant to Tennessee Code Annotated § 36-1-113(g)(3).

## C. Failure to Provide Suitable Housing

The trial court found that the Department proved a third ground, the ground of abandonment by failure to provide a suitable home as set forth in Tennessee Code Annotated § 36-1-102(1)(A). The statute reads:

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and *for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child*, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the

-10-

parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

The relevant period of time in this action was from May 15, 2011, the date the child was taken into protective custody, until September 15, 2011, four months later. We agree with the finding that Mother failed to obtain suitable housing during the relevant period; however, the record is devoid of evidence that the Department made any effort to help Mother obtain housing during the relevant four months following the child's removal. Admittedly, the Department helped Mother obtain housing but little effort was made during the relevant time period. In fact, the Department admitted in oral argument that it did not help Mother obtain housing in the first four months, and the record is consistent with this admission. Thus, we have concluded that the record does not support the finding that the Department made reasonable efforts *during the relevant period*. Accordingly, the Department did not prove that Mother abandoned her child under Tennessee Code Annotated § 36-1-102(1)(A)(ii) by failing to provide a suitable home.

## D. Failure to Provide Support

The trial court also found Mother abandoned her child by willfully failing to support her pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and § 36-1-102(1)(A)(i). The Department did not defend this ground on appeal; in fact, the Department was silent as to whether there is clear and convincing evidence to support this ground to terminate Mother's parental rights, a decision we understand to mean that the Department implicitly agrees with Mother's assertion that the evidence is insufficient to prove this ground. *See In re Meagan E.*, No. E2005-02440-COA-R3PT, 2006 WL 1473917, at *7 (Tenn. Ct. App. May 30, 2006) (This court interpreted Appellee's silence in brief as to the issue regarding abandonment by failure to visit as an "abandon[ment] [of] any defense of the trial court as to this issue."). We also examined the record and have concluded that the evidence is insufficient to establish that Mother willfully failed to financially support her child during the relevant period.

## E. Mental Incompetency

Mother also contends her parental rights may not be terminated because the Department failed to prove that she was mentally incompetent. More specifically, Mother argues that the Department had to provide expert proof of her diagnosis because her mental health affects the other grounds to terminate Mother's parental rights. The trial court found that the Department failed to establish the ground of mental incompetence; however, this fact does not preclude the termination of her parental rights. This is because the Department

-11-

proved two grounds for termination and only one ground is required. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

We acknowledge that Mother is in need of mental health care, including counseling, medication, and treatment, and that this circumstance is relevant because it pertains to her inability to parent. However, Mother has not contended that the Department failed to exert reasonable efforts in treating her mental health needs, and the record reveals that the Department exerted reasonable efforts to assist her to improve her mental health in order to accomplish the other goals. More relevant to this issue is that Mother's alleged mental incompetency is not a ground on which her rights were terminated. Because mental incompetency is not a ground upon which we terminate Mother's parental rights, we find this argument without merit.

Parental rights may be terminated when only one statutorily defined ground is established. *See* Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). We have affirmed the trial court's finding of two grounds for termination, substantially comply with the perman ency plan and persistence of conditions; therefore, we shall address whether termination of Mother's parental rights is in the best interest of the child.

## IV. Best Interests of the Child

The General Assembly has provided a list of factors for the court to consider when conducting an analysis of the best interests of the children. *See* Tenn. Code Ann. § 36-1-113(i)(1)-(9). The nine statutory factors, which are well known and need not be repeated here, are not exclusive or exhaustive, and other factors may be considered by the court. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Moreover, not every statutory factor need apply; a finding of but a few significant factors may be sufficient to justify a finding that termination of the parent-child relationship is in the children's best interests. *See In re M.A.R.*, 183 S.W.3d at 667. The children's best interests are to be determined from the perspective of the children rather than the parent. *See State Dep't of Children's Servs. v. L.H.*, No. M2007-00170-COA-R3-PT, 2007 WL 2471500, at *7 (Tenn. Ct. App. Dec. 3, 2007) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

The record shows that since the child has been removed from Mother's care, she has thrived under the stability of a pre-adoptive family who wish to adopt her. Previously, Aaliyah had to repeat a grade because of her instability when residing with Mother. Currently, the child is on the honor roll and has no problems at home or in school.

Further, allowing the child to return to Mother would subject the child to more instability, due to Mother's inability to acquire sufficient housing and her transient history. Moreover, it would require the removal of the child from an environment where her conditions have dramatically improved and she is much happier and healthier. Tenn. Code Ann. § 36-1-113(i)(5).

The trial court found that the termination of Mother's rights was in the best interest of the child because Mother failed to make an adjustment of circumstances, conduct and conditions to make it safe for the minor child, as evidenced by her failure to demonstrate a timely ability of residential and financial stability, Mother failed to successfully make a lasting adjustment after the Department's reasonable efforts, Mother failed to maintain regular visitations and establish a substantial bond between her and her child, Mother failed to have a meaningful relationship with the child, Mother's inability to provide a safe and secure environment for her child, and that Aaliyah has established a very strong parent-child relationship with her foster family.

Considering these and many other relevant factors from the child's perspective, the evidence clearly and convincingly demonstrates that it is in the child's best interests that the parental rights of Mother be terminated. Therefore, we affirm this finding.

## IN CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with costs of appeal assessed against Mother.

_____
FRANK G. CLEMENT, JR., JUDGE

-13-